### YOUNG v. REED et al.

No. 6029.

Court of Appeal of Louisiana. Second Circuit.

Nov. 3, 1939.

Rehearing Denied Dec. 1, 1939.

Writ of Certiorari Denied Jan. 9, 1940.

782

·Harry V. Booth, of Shreveport, for appellant.

Russell E. Gahagan, of Natchitoches, for appellees.

### TALIAFERRO, Judge.

Plaintiff, for his own account, and as the assignee of labor claims of fourteen (14) fellow workmen, seeks to recover judgment against the defendants, Dr. C. R. Reed and G. F. Thomas, in solido, for the sum of $1,414, on the theory that said defendants and one N. W. DeSoto, associated themselves together as partners or joint adventurers for the purpose of exploiting for oil and gas, tracts of land in Sec. 7, T. 16N, Range 11W in Bossier Parish, and for that reason became responsible for the payment of all of the indebtedness incurred in the drilling of. a well on said land in furtherance of the interest of the joint adventure.

Plaintiff alleges that said partnership acquired certain oil and gas leases covering land in said section, township and range, wherein it was stipulated that a well in search of oil and/or gas should be drilled within a specific period to a depth of 3,000 feet, unless paying production at a lesser depth was discovered; that petitioner and the laborers for whom he sues, were employed ·by the said DeSoto, acting for the partnership and with the knowledge and consent of the defendants, his copartners, to. render service and labor in the drilling of the well, known as Douty No. 2, in said section, township and range.

Plaintiff further avers that all members of said partnership often visited the situs of the well before it was abandoned, admitted their association as copartners and from time to time acknowledged their obligations to him and the members of his crew for payment of their wages; that the said partnership association was named and called "Dr. C. R. Reed of Natchitoches, Louisiana, Trustee"; and, after the abandonment of said well, had no assets or property of any character and has been dissolved.

Defendants each filed a dilatory exception, which was overruled. It is not urged here, therefore, we do not discuss its character or merits.

Defendants severed in their answers, but the averments of each and the defenses urged are practically identical. They expressly deny that there was any partnership relation between them and N. W. DeSoto, and that they ever held themselves out as. such; and deny that the association and business relation of the three was of such a nature and character to superinduce liability as partners or otherwise. They deny, therefore, primarily that they owe plaintiff or his assignees any amount whatsoever.

Further answering, these defendants aver that the drilling of the well referred to by plaintiff was promoted entirely by DeSoto; that they had nothing whatever to do with hiring the labor used thereon, nor the fixing of their daily wage, nor the financing of the venture, and exercised no supervision over the drilling as it progressed. They allege further that DeSoto "drilled and financed the well under the unit system" and that he "divided the venture into 160 units of the par value of $100.00 each." They admit that each of them owned three of said units, and beyond this, they aver that they had no financial or .other interest in the well; that the remaining 154 units. were owned by approximately 50 other investors.

Firstly, in the alternative, defendants aver that if the owning of said three units in the venture operated to commit them to responsibility for any part of the expense thereof, as partners, that such responsibility for each of them may not exceed 3/160 of said expense.

Secondly, in the alternative, they aver that should their first alternative defense be rejected, in that event their · liability as. partners, if they be decreed to have been such, is limited to their virile share as unit holders, of whom, they allege, there were approximately fifty.

In reconvention, defendants allege ·that in the year 1934 they were sued by plaintiff

in the District Court of Bossier Parish on the identical cause of action herein declared upon and that they were forced to pay $117.95 costs to the clerk of that court in that case, although finally successful therein. Each defendant prays for judgment for one-half of said cost, or $58.98, in reconvention against plaintiff to reimburse them respectively for said outlay.

There was judgment in favor of plaintiff and against defendants in solido for $23.56 and costs. The reconventional demands were rejected. Plaintiff appealed and complains of the inadequency of the judgment in his favor.

Defendants, answering the appeal, reurge the reconventional demands and pray for amendment of the judgment accordingly.

It appears that prior to May, 1933, F. L. Kyle and W. D. Ball of Caddo Parish held a mineral lease or leases to approximately 500 acres in Sections 7, 17, and 18 in Township 16N, Range 11W, Bossier Parish. Kyle and Ball were obligated, as lessees, to drill a test well on the land to a depth of 3,000 feet unless paying production was encountered at a lesser depth, and within a definite time. It also appears that these lessees were unable, for financial or other reasons, to make the test within the term stipulated, and, wishing to avoid a forfeiture of their lease rights entirely, approached N. W. DeSoto with a view of interesting him in putting the test well down. He had previously purchased a drilling rig and equipment from defendant Thomas, which was unpaid for. Thomas was then pressing DeSoto for payment of the balance due on the outfit, which was then in DeSoto Parish. Kyle and Ball proposed to give to DeSoto one-half interest in their said lease holdings if he would drill the well required by the lease contract. He was friendly to the proposition but could not lawfully move the rig into Bossier Parish without Thomas' consent. Dr. Reed had become interested in the proposition also and he, Kyle, Ball and DeSoto went to Thomas' office in the City of Natchitoches to discuss the matter with him. There DeSoto proposed to let Thomas and Dr. Reed in on the proposition made to him by Kyle and Ball on this basis:

That he would give to each of them one-third of the interest in the leases which Kyle and Ball proposed to assign to him, provided Thomas would consent to the removal of the mortgaged rig on the leased lands, and, in addition, that he and Dr. Reed

would pay the expenses of such removal; and also, at their expense, erect a derrick where the well would be drilled. DeSoto's proposition was accepted and on May 30, 1933, Kyle and Ball assigned to DeSoto, Thomas and Dr. Reed jointly an undivided one-half interest in the leases referred to. On the same day DeSoto, Thomas and Dr. Reed, individually, assigned to "Dr. C. R. Reed, Trustee", 80 acres of the leased land located in Sec. 18, on which the well was drilled. It proved to be a "dry hole".

It appears that the well was drilled under DeSoto's personal supervision and was financed, in whole or largely, by issuance of unit certificates to various persons at a price of $100 each. He was an experienced oil man.

After the well was abandoned, Kyle and Ball, realizing impending loss of their lease rights, proposed to assign their remaining one-half interest therein to DeSoto, Thomas and Dr. Reed on condition that another test be made. This proposition was accepted and was consummated on August 3, 1933 by formal assignment between the parties. A new location was made for a well in Sec. 7, less than a mile distant from the first one, and the rig was moved thereon and a new derrick erected at the expense of Dr. Reed and Thomas. DeSoto assured them that the well could and would be financed by employing the unit system as had been done with the other well; and in order to effectuate the scheme, again Dr. Reed individually, Thomas and DeSoto, conveyed to "Dr. C. R. Reed, Trustee", the 80 acres in Sec. 7 on which the new location had been made. This was done on December 8, 1933. Drilling began on December 1, 1933. The well was abandoned on February 18, 1934. It is referred to as "Douty No. 2".

DeSoto proposed to Dr. Reed and Thomas that the new well be financed by issuance of 160 unit certificates of a par value of $100 each. This was agreed to, but it appears that not over 60 units were actually disposed of. DeSoto, it was understood, would be the owner of all units not sold. Dr. Reed signed the certificates as trustee whenever a sale was made. He and Thomas took three units each to compensate them for moving the rig to the new site and the erection of a derrick thereon.

It is admitted that there was no trustee agreement, oral or written, between the parties beyond the fact that in case the well was a success all unit holders would

participate in its output in the proportion their certificate or certificates bore to 160.

The venture appears to have been financially embarrassed from the beginning, due to inability to promptly dispose of units. Frequent demands were made upon Dr. Reed for funds to meet the payrolls. We think he responded to some of these in part from his own cash and in part from trustee funds. We are also convinced that to a material extent, the workmen depended upon his and Thomas' assurances that they would all finally be paid in full, and, for this reason, continued to work at the well, although default in meeting their earned wages occurred time and again. Plaintiff, Young testified that he would have quit work long prior to the abandonment of the well had it not been for these defendants' said assurances. It is certain none of the workmen looked to the unit holders, as such, for their pay.

The essential and self evident facts of this case, and which are controlling of the primary issue of partnership or joint adventure relation between DeSoto, Thomas and Dr. Reed, are these:

These three men owned mineral lease rights on nearly 500 acres of land, all or practically all, in a body. If a producing well could be brought in on the tract, each of them would certainly become wealthy as an immediate result. DeSoto was inpecunious to the knowledge of Mr. Thomas and Dr. Reed, and they, if financially able to do so, would not risk the financial hazard necessary to drill another test well. They were all equally interested in seeing the well drilled, and if they had undertaken personally to finance the operation, no one would likely contend that they would not now be personally responsible for the expense thereof. Their relation would unquestionably be that of ordinary partners or joint adventurers. Can it be said that because of the unique method resorted to to try to exploit the land for gas and oil, that this alters the situation? We do not think so. In a sense, defendants were simply reducing their right to participate in the output, if any, of this second well to their ownership therein, in return for money necessary to finance a proposition that might mean great riches to them. Immense profits would have been theirs in the event of the well's success, in which they would have equally shared; and this would have been true of any other well brought in on the trustee 80, because it is made

clear that all unit holders' interest was limited to this one well, Douty No. 2.

Whatever else may be said on the subject, it is obvious that the drilling of the two wells were simply efforts to develop the land for oil and gas in keeping with the obligation assumed by Kyle and Ball and passed on by them to the defendants conjointly with DeSoto. Thomas made a contribution to these ventures by allowing the drilling rig and equipment moved into Bossier Parish. He and Dr. Reed made joint contributions toward the ventures by paying the expense of the rig's removal each time and the erection of the derricks. DeSoto's contribution consisted in the use of the unpaid for rig and his actively supervising the drilling as it progressed. In view of all these facts, it seems not reasonable to contend that these men should escape liability for the expenses incurred in drilling the second well. To admit such a defense would be tantamount to holding that they could by indirection escape a liability and accomplish a purpose not possible by direct action. It would be equivalent to shifting to the shoulders of the unit holders a liability incurred almost wholly for the benefit, directly and indirectly, of the three promoters of the exploitation.

We are clear in the opinion that defendants and DeSoto, in drilling the second well, engaged in a joint adventure within the definition of that term as announced in Daily States Publishing Company, Limited, v. Uhalt, 169 La. 893, 901, 126 So. 228, 231, to-wit:

"A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation."

Further, the court therein said, as regards this sort of association, viz.:

"A joint adventure has also been defined as 'An association of two or more persons to carry out a single business enterprise for profit.' Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436, 440. It has been held that a corporation may be a member of a joint adventure, the purposes of which are within its corporate powers. Tusant & Son Co. v. Ches. Weitz Sons, 195 Iowa, 1386, 191 N.W. 884. The relations between joint adventures are assimilated to those of partners inter se. Ludeau v. Avoyelles Cotton Co., supra [164 La. 275, 113 So. 846]. As respects the character of the business

undertaken, the principal difference between a partnership and a joint adventure 'is that, while a copartnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years.' "

It is said in Ault & Wiborg Company of Canada, Ltd. v. Carson Carbon Company et al., 181 La. 681, 688, 160 So. 298, 300, that:

"The legal relation of joint adventure now widely recognized in judicial decisions results from the undertaking by two or more persons to combine their property or labor in the conduct of a particular line of trade or general business, for joint profits, creating the status of a partnership, although the facts do not show a formal partnership. While a joint adventure is not identical with a partnership, it is analogous to a partnership and is controlled largely by the principles or rules applicable to partnerships. But there is no joint adventure where an actual partnership exists or where the business or enterprise is organized and operated in corporate form. See annotations to Keiswetter v. Rubenstein, 48 A.L. R. 1055 et seq., and Bond v. O'Donnell, 63 A.L.R. 909 et seq."

Liability for the obligations created by or arising from a joint adventure as between the participants inter se, is to be determined from the character of the business or undertaking engaged in.

"The relation of joint adventurers is governed by the principles which constitute and control the law of partnership." 15 R.C.L., page 500.

"Partnerships are divided, as to their object, into commercial partnerships and ordinary partnerships." Civil Code, Art. 2824.

Commercial partnerships, in the main, are those which are formed for the purchase and sale of personal property and for carrying personal property for hire in ships, other vessels, or otherwise. Civil Code, Art. 2825.

Arts. 2826 and 2873 of the Civil Code read:

"Ordinary partnerships are all such as are not commercial; they are divided into universal and particular partnerships."

"In the ordinary partnership, each partner is bound for his share of the partnership debt, calculating such share in proportion to the number of the partners, without any attention to the proportion of the stock or profits each is entitled to."

It is certain that a partnership formed to drill oil wells comes within the definition of an ordinary partnership, above quoted. Perryman v. Boisseau, et al., 19 La.App. 43, 138 So. 141. Each member thereof is responsible only for the debts and obligations of such a partnership to the extent of his virile share, which is determined from the number of members and not by the extent of their interest or capital investment therein.

Therefore, the liability of defendants for the amount herein sued for is only one-third thereof.

DeSoto did not defend plaintiff's suit against him on this same cause of action in Bossier Parish, which was appealed by the present defendants to this court and was finally passed on by it. 157 So. 809. Judgment by default went against him. He was not a witness in that case, nor was he in the present one. His whereabouts at time of and prior to last trial was unknown to all the parties. Whatever records were kept of the drilling operation were in his possession. None were produced.

In the Bossier Parish suit defendants did not contest the correctness of the labor claims sued on. Judgment for the full amount of same was rendered for the plaintiff. Here, defendants generally deny the correctness of these claims, but offer no testimony to support this position. Neither knows whether the claims are correct or not. In the main, the correctness of these various claims was established by direct, positive testimony, while as to others a prima facie case only was made out. However, since defendants offered nothing to rebut this prima facie case, we conclude that plaintiff's case has been made out for the entirety of the claims sued on. There is an abundance of testimony to the effect that DeSoto, on many occasions, acknowledged that these claimants were due the amounts they contend for.

Several of the assignors testified in the Bossier Parish case and, inter alia, established the correctness of their respective labor claims. They were cross-examined by defendants' counsel. Their testimony was reduced to writing and forms a part of the record in that case. These claimants, like DeSoto, could not be located

for the trial in the present suit. We think due diligence to locate them was shown. It consisted of efforts by plaintiff and his counsel. These men follow oil field work and it is not surprising that, after the lapse of four years, they could not be found. Their testimony was offered in evidence by plaintiff, but, on objection, was ruled out. Plaintiff excepted and brings up the proffered evidence as part of a formal bill of exception. The ruling of the court is complained of here. We think it erroneous. A sufficient foundation for its admissibility was laid.

The question tendered by the ruling is not new. It has frequently arisen in this state. Early in the history of our jurisprudence the Supreme Court definitely held:

"Testimony of a witness in a previous suit between the same parties, for the same cause of action, where there has been an opportunity for cross-examination, may be used by either party, if the witness be dead or absent, or, for other cause, cannot be produced. * * *

"Complete mutuality or identity of all the parties is not necessary to admit testimony in a former suit. It generally suffices if the issue be the same, and the party against whom it is offered had full power of cross-examination."

Rouyer et al. v. Carroll, 47 La.Ann. 768, 775, 17 So. 292, 294; Hennen v. Monro, 4 Mart., N.S., 449; Miller v. Russell, 7 Mart., N.S., 266, 267; Noble v. Martin et al., 7 Mart., N.S., 282, 283; Williams v. Bethany, 1 La. 315, 320; Lopez's Widow and Heirs v. Berghel, f. w. c., 15 La. 42, 43; Conway v. Erwin, 1 La.Ann. 391; W. A. Taylor v. J. A. Paterson, 9 La.Ann. 251.

The announced rule finds support in Jones' excellent work on evidence, 4th Ed., Vol. 1, page 621.

Defendants are not entitled to recover on their reconventional demands. They each appealed devolutively from the personal judgment against them in the former suit, which cast them for costs. Therefore, the payment of these costs to prevent issuance of execution. However, the final decree of this court (157 So. page 811) did not cast plaintiff for any costs excepting those incurred in this court. The costs of the lower court were specifically ordered paid from the proceeds of sale of the property provisionally seized. This being true, plaintiff was under no obligation to reim-

burse the present defendants for the costs sued for. They should have looked to the proceeds of sale of the seized property for reimbursement.

It appears that no part of the indebtedness sued for in the Bossier Parish suit was paid from the proceeds of the sale of the property therein seized.

Therefore, for the reasons herein assigned, the judgment appealed from is amended by condemning the defendants, Dr. C. R. Reed and G. F. Thomas, each to pay to plaintiff the sum of Four Hundred Seventy-One and 33/100 ($471.33) Dollars, with 5% per annum interest thereon from judicial demand herein until paid, and all costs of this suit; and, as amended, said judgment is affirmed.