GARDINER, Judge.
G. Wray Gill has appealed the judgment of the trial court in No. 3623 against him and in favor of plaintiff for $12,951.22 plus interest and costs. He has also appealed the dismissal of his reconventional demands for the rental value of vehicles loaned to Duncan for his use and for alleged losses on the lease due to Duncan’s negligence. Defendants Quartararo, Lip-man, Fisher, Guidroz, and Mrs. Josie De-laune, widow and testamentary executrix for the Succession of Dr. Nicholas J. Chetta, have appealed from the judgment in favor of Duncan finding them each liable for a % share of the judgment. In the consolidated suit No. 3624, Gill has appealed the judgment against him in favor of plaintiff for $5,630.82 plus interest and costs on a promissory note executed July 7, 1959.
*377 Proceeding No. 3623, “Edwin B. Duncan, d/b/a E. B. Duncan Drilling Contractor v. G. Wray Gill, Dr. Nicholas J. Chetta, Dr. Fernando Carlomagno, Alice Guilbeau Guidroz, Charles Quartararo, Theresa J. L. Lipman, Dr. William Fisher and Frank Dane” was a suit for money advanced and for services, materials, labor and supplies furnished by Duncan for the account of Gill and his working interest partners for their drilling operations in Madison County, Mississippi, during the calendar year of 1959. These working interests had been purchased between April 7th and June 8th, 1959. The amount sought by plaintiff was $12,951.22 plus legal interest from date of judicial demand and all costs. This action was filed on December 7, 1959.
Proceeding No. 3624, “E. B. Duncan Drilling & Well Servicing Co., Inc. v. G. Wray Gill,” La.App., 227 So.2d 386 was a suit on a promissory note signed by Gill on July 7, 1959, in the principal sum of $5,630.82 plus 6% interest from date of issuance until paid and all costs. This action was filed April 12, 1962.
These actions arose out of a written agreement between Duncan and “G. Wray Gill, Trustee,” dated April 17, 1959, wherein Gill retained the services of Duncan and his Cabot drilling rig to drill a well to a depth of not more than 4,000 feet in Madison County, Mississippi, on the Crawford lease then owned by Gill. Duncan was to provide: his Cabot drilling rig; his personal supervision; two trucks, including the one upon which the drilling rig was mounted; 3,000 feet of drill pipe and 150 feet of 4j4 inch drill collars; and the necessary repairs and repainting of the rig to put it in first-class condition before drilling commenced. Gill was to furnish: $5,000 upon the signing of the contract; $2,500 after surface pipe was set as an advance to meet payroll, insurance, taxes, etc., and was to be responsible for all expenses ; a truck for Duncan’s use from contract date until the drilling rig was returned to Louisiana; all pipe and collars that would be needed over and above those owned by Duncan and available for this operation; $25.00 per day for Duncan’s supervision, all of his expenses, plus 8^ per mile for use of Duncan’s automobile; replacement for any loss of equipment furnished by Duncan other than ordinary wear and tear; and all expenses of moving the equipment to and from its location at Shreveport, La. This contract was agreed upon by phone between Duncan and Gill based upon the arrangements between Duncan and a man named Ray Baker who had sought out Duncan on behalf of Gill. The contract was entered into by Gill as “Trustee” but there was no disclosure made of the terms or principals of the trust.
Duncan moved his rig and equipment to Madison County, Miss., and, after making the repairs agreed to in the contract, commenced drilling operations on approximately May 1, 1959. Drilling progressed normally until May 21, 1959, when the depth of 3,708 feet was reached and an electric log was run on the well to determine its oil bearing potential. At this depth drilling operations ceased and the subsequent operations performed on this well after May 21st were the laying of pipe and other steps of completion necessary to make the well produce oil.
On approximately June 1, the rig was moved and set up to drill another well, not provided for in the written contract between Duncan and Gill. The well was drilled, casing was placed in the well and, on approximately June 11th, the rig was moved to the site of an older well that had been plugged, but which was on the same lease property. The plug was drilled and the well reworked in preparation for its use as a salt water disposal well for the other producing wells.
Work was then resumed on the first well drilled, the one originally covered by written contract, and forms were made, foundations laid, and pumps, lines and tanks were installed. This operation continued from mid-June through mid-September, at which time Duncan moved his rig back to Shreve *378 port. During the period from mid-June through mid-September there were delays caused by a lack of equipment and equipment breaking down but during this whole period of time Duncan was engaged in activities directed toward making the first well produce oil. Some oil was produced and disposed of, this oil forming a partial basis for Gill’s reconventional demand. No one questions the fact that Duncan performed valuable work on the lease property; the defense denies liability for payment because of lack of authorization to perform the work.
Duncan claimed that all work done after May 21 was authorized and requested by Gill personally. He was in almost daily telephonic communication with Gill and Gill was aware of all of the developments and problems connected with the drilling and all decisions were made by Gill. Gill was also informed that work was being done by periodic billings. There were also three or four occasions after May 21 when Duncan and Gill got together and discussed the lease, the drilling operations, the production, etc. When Duncan became convinced that he was not going to be paid by Gill, he moved his rig back to Louisiana and a few months later instituted this suit. Duncan stated that the note dated July 7th was given to settle Gill’s account with him. According to Duncan’s records as of July 7, Gill owed $9,130.82 for which he gave Duncan a check for $3,500 and the note in question for $5,630.82.
Gill claimed that when the drilling of the first well was completed at the depth of 3,708 feet his contract with Duncan was terminated and everything that Duncan did after May 21 was without his knowledge or authorization and he, therefore, had no liability to Duncan for this work or that done on the other two wells. He denied Duncan’s claim that he and Baker were partners and that Baker was his representative authorized to deal with Duncan.
Gill filed a reconventional demand in Duncan’s action for the services and money advances, wherein he claimed that Duncan was indebted to him for the rental value of an automobile and truck used by Duncan during the'time of the drilling of the wells and which Duncan did not voluntarily return at the termination of drilling. Gill also alleged damages for Duncan’s negligence in setting up and operating the pumping equipment, resulting in a loss of income to Gill and the subsequent loss of the lease.
After filing his original petition for payment based on the written contract, Duncan amended his pleadings to also seek recovery based on quantum meruit for the work performed, material secured and monies advanced.
After the filing and disposal of many exceptions, amendments to the pleadings, continuations, and a consolidation of the actions, a hearing was set before a Commissioner. In accordance with an order issued on November 5, 1964, by the Judge of Division “A” of the Civil District Court for the Parish of Orleans, the matter was tried before the Commissioner and Judge Ad Hoc for the Civil District Court for 25 days commencing on April 6, 1966. It was finally concluded with the submission of written briefs filed with the Commissioner on June 28, 1968. The Commissioner then considered the pleadings, evidence and report filed February 17, 1964, by the expert appointed by the Court on April 9, 1962, to review Duncan’s expenditures and disbursements and the Commissioner submitted a written report wherein he found that: there was no pause in the work; Gill’s continued involvement and direction did not substantiate his position that he was no longer involved in the operation after May 21; and, Gill was aware of the operation and made various payments after May 21. He also found that the other defendants were joint venturers with Gill and had entrusted operations to Gill. Regarding the note, the Commissioner found that Gill had received consideration for the note in the settling of his account with Duncan as of the date of issuance. *379 Gill’s reconventional demand was found lacking in substance and was denied. The Commissioner filed the following recommended judgment in the consolidated cases:
“It is ordered, adjudged and decreed that in Proceedings No. 376-450 there be judgment herein in favor of plaintiff Edwin B. Duncan, d/b/a E. B. Duncan Drilling Contractor and against the defendant G. Wray Gill in the full sum of Twelve Thousand Nine Hundred Fifty-One and 22/100 ($12,951.22) Dollars plus legal interest thereon from date of judicial demand until paid and for all costs of these proceedings;
“It is further ordered, adjudged and decreed that each of the defendants, Dr. Fernando Carlomagno, Alice Guilbeau Guidroz, Charles Quartararo, Theresa J. L. Lipman, Dr. William Fisher, Frank Dane and Mrs. Josie Marie Delaune, Widow of Nicholas J. Chetta, the executrix of the Succession of Dr. Nicholas J. Chetta, be and they are hereby liable unto Edwin B. Duncan, d/b/a E. B. Duncan Drilling Contractor along with the said G. Wray Gill but only to the extent of one-ninth of the said sum of Twelve Thousand Nine Hundred Fifty-one and 22/100 ($12,951.22) Dollars or One Thousand Four Hundred Ninety-three and 02/100 ($1,493.02) Dollars due by each, plus legal interest thereon from date of judicial demand until paid; and each are liable for all costs of these proceedings.
“It is further ordered, adjudged and decreed that in Proceedings No. 400-264 there be judgment herein in favor of plaintiffs E. B. Duncan Drilling & Well Service Co., Inc. against the defendant G. Wray Gill in the full sum of Five Thousand Six Hundred Thirty and 82/100 ($5630.82) Dollars, together with 6% per annum interest thereon from July 9, 1959, until paid and for all costs of these proceedings.
“It is further ordered, adjudged and decreed that there be judgment in favor of plaintiff and against the defendant decreeing that defendant’s reconventional demand be and the same is hereby dismissed at the cost of the defendant.”
This report was accepted and the recommended judgment was adopted verbatim by the appointing judge without any objection by the defendants or their attorneys. It is from this adopted judgment that the defendants now make their respective appeals. Two of the defendants, Dr. Fernando Carlomagno and Frank Dane, have not appealed nor answered the appeal and the judgment as affecting these defendants is now final.
There are many issues in this case that, for various reasons, have not been identified or urged upon appeal and we will not address ourselves to these issues; we will only concern ourselves with the issues raised on appeal.
The first issue that requires determination is the application of the written contract between Duncan and Gill and the date that it ceased to affect the rights and ©bligations of the parties. By its terms, this contract was to remain in effect and force from April 17, 1959 until a well was drilled on the Crawford lease to a maximum depth of 4,000 feet. Thus, under the terms of this agreement, this contract was terminated on May 21, when drilling was terminated at 3,708 feet. At that time the $5,000 contract price was earned and that was the only amount due for the use of the rig from April 17 through May 21.
The next issue requiring determination is the defendants’ liability, other than under the contract, for work done after May 21st and the basis for that liability. Duncan had originally sought recovery under the contract but subsequently amended his pleadings seeking recovery on a quantum meruit basis for work done after May 21. Since there is no written indication of any subsequent agreement, parol evidence must form the basis of the evidence of an agreement between Duncan and Gill and *380 the credibility and demeanor of the witnesses greatly determines the parties’ positions.
The Commissioner in his report found that nothing introduced at the trial altered the fact that once the first well was drilled, the second well was drilled and work was performed on the old Carter well to put the first well on production, all without interruption. He also found that Gill had been completely involved from the date the written contract was signed until Duncan moved his rig.
“Gill’s continued involvement and direction does not substantiate his position that he had no responsibility for the operation after May 21, 1959.
“It is abundantly clear from the testimony that Gill was aware of the operation and activities that occurred after May 21, 1959. He received billings from Duncan during the period from May through October of 1959, which billings he accepted without protest. Additionally, Gill made payments in varying amounts and at various times against these statements as he was financially able to do so or as Duncan was able to prevail upon him to make.”
We find that Gill’s stated position, that he was unaware of and had not authorized the work that was done, is not substantiated because we find sufficient evidence in the record to indicate Gill’s involvement in the lease activities performed by Duncan and his direction of those activities. After May 21, Gill was still selling working interests in the first new well drilled and the old Carter well and we must assume that he would not sell an interest in the well if he was not aware that work was being performed to make it a producing well and that he was authorizing such work; otherwise, he would be misleading the purchasers as to the interest they were purchasing.
In July he participated in the securing of second-hand casing used in the well, which casing later caused many problems in its use. In August and September, 1959, he secured the services of a well-servicing company to correct a problem that arose with the pump at the well, again attempting to make the well a producer and working with Duncan in this endeavor.
Defendant Gill devotes a large part of his appellate brief to the concept that this case largely depends on the acceptance of the credibility óf Duncan over Gill and the fact the Duncan cannot be believed. He contends that credibility is crucial since there was no written agreement and conflicting parole evidence forms the only basis for recovery based on quantum meruit for work authorized by Gill.
Although we find instances where Duncan’s testimony contains inconsistencies, we must look to the overall testimony in determining the credibility of a witness. The Commissioner was able to observe the demeanor of the witnesses while they were testifying and was able to evaluate their testimony in that light. He believed the overall testimony of Duncan to be more logical and credible than that of Gill and we find no evidence in the record which would indicate error on his part.
We find it difficult to believe the testimony of Mr. Gill to the effect that he, a lawyer, was not really involved in the lease operation but signed the contract with Duncan and indiscriminately made payments toward the lease operation on behalf of Ray Baker, who was not his partner and had no recorded interest in the lease, without requiring any accounting for the money of the working interest owners so advanced or informing these purchasers of Baker’s involvement. Ray Baker has since died and is unable to clarify the many ambiguities regarding his dealing with Duncan and Gill. The lease was owned wholly by Gill personally and his claim that Baker had an % overriding royalty interest is not substantiated in any form other than his interrogatory answer. Gill also claimed that all work done after May 21 *381 was authorized by, and for the interest of, Baker and any payments made were made for Baker, yet no one else apparently knew of this alleged interest Baker had in the lease, including the purchasers of the working interest shares, who dealt with Gill, paid Gill and relied on Gill to handle the operation for them. Although he used the term “Trustee” loosely in his dealings with the working interest owners, Duncan and third parties, he was never a trustee in fact and did not observe any fiduciary relationship with the other owners. Thus we find that the overall testimony of Duncan is more logical and credible than that of Gill and is the more logical explanation of the lease activity from May 21 through September 14, when Duncan moved his rig. It would he an unreasonable explanation to find that Duncan remained on the lease, performed work, supplied materials and advanced funds for payrolls, etc., without any indication that Gill would be responsible for these costs.
Gill also attempted to implicate Duncan in a scheme with the neighboring owner, Lee Rattner, to drill wells on Rattner’s property and attempt to secure payment for these wells from Gill. Although Gill has proven that Duncan knew Rattner and that they had discussed Duncan’s drilling some wells for Rattner, Gill has not proven any agreement for the property adjoining his lease.
We have found that Gill was in charge of and responsible for Duncan performing the work on the lease after May 21 and we must now determine what work he was responsible for personally and what the other interest owners were responsible for and in what proportion.
With regard to the first new well and the old reworked well, the parties stood in the relationship of joint venturers or ordinary partners and their liability was for their virile share.
LSA-C.C. art. 2826 defines an ordinary partnership:
“Ordinary partnerships are all such as are not commercial; they are divided into universal and particular partnerships.”
Article 2873 sets out the liability of ordinary partners:
“In the ordinary partnership, each partner is bound for his share of the partnership debt, calculating such share in proportion to the number of the partners, without any attention to the proportion of the stock or profits each is entitled to.”
Numerous cases have held that a partnership formed to drill oil wells is an ordinary partnership and each partner is bound for his virile share, but not in solido. Langston v. Red Iron Drilling Co., 38 F.Supp. 136 (D.C.1941); Phillips v. Ray, 1 La.App. 584 (1925); Green v. Hawkins and Antoon, 144 So. 271 (La.App.1932); Posey v. Fargo, 170 So. 512 (La.App.1936), affirmed 187 La. 122, 174 So. 175 (1937); Young v. Reed, 192 So. 780 (La.App. 1939). A review of the law regarding joint ventures is contained in Young v. Reed, supra, and indicates that a joint venture is an informal undertaking between two or more persons for a particular business enterprise. The court there stated at pages 784-785:
“We are clear in the opinion that defendants and DeSoto, in drilling the second well, engaged in a joint adventure within the definition of that term as announced in Daily States Publishing Company, Limited v. Uhalt, 169 La. 893, 901, 126 So. 228, 231, to-wit:
“ ‘A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.’
*382 “Further, the court therein said, as regards this sort of association, viz.:
“ ‘A joint adventure has also been defined as “An association of two or more persons to carry out a single business enterprise for profit.” Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436, 440. It has been held that a corporation may be a member of a joint adventure, the purposes of which are within its corporate powers. Tusant & Son Co. v. Ches. Weitz Sons, 195 Iowa, 1386, 191 N.W. 884. The relations between joint adventures are assimilated to those of partners inter se. Ludeau v. Avoyelles Cotton Co., supra [164 La. 275, 113 So. 846]. As respects the character of the business undertaken, the principal difference between a partnership and a joint adventure “is that, while a copartnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years.’ ”
“It is said in Ault & Wiborg Company of Canada, Ltd. v. Carson Carbon Company et al., 181 La. 681, 688, 160 So. 298, 300, that:
“ ‘The legal relation of joint adventure now widely recognized in judicial decisions results from the undertaking by two or more persons to combine their property or labor in the conduct of a particular line of trade or general business, for joint profits, creating the status of a partnership, although the facts do not show a formal partnership. While a joint adventure is not identical with a partnership, it is analogous to a partnership and is controlled largely by the principles or rules applicable to partnerships. But there is no joint adventure where an actual partnership exists or where the business or enterprise is organized and operated in corporate form. See annotations to Keiswetter v. Rubenstein, [235 Mich. 36, 209 N.W. 154] 48 A.L.R. 1049, 1055 et seq., and Bond v. O’Donnell [205 Iowa 902, 218 N.W. 898] 63 A.L.R. 901, 909 et seq.’
“Liability for the obligations created by or arising from a joint adventure as between the participants inter se, is to be determined from the character of the business or undertaking engaged in.
“ ‘The relation of joint adventurers is governed by the principles which constitute and control the law of partnership.’ 15 R.C.L., page 500.
“ ‘Partnerships are divided, as to their object, into commercial partnerships and ordinary partnerships.’ Civil Code, Art. 2824.
“Commercial partnerships, in the main, are those which are formed for the purchase and sale of personal property and for carrying personal property for hire in ships, other vessels, or otherwise. Civil Code, Art. 2825.
“Arts. 2826 and 2873 of the Civil Code read:
“ ‘Ordinary partnerships are all such as are not commercial; they are divided into universal and particular partnerships.’
“ ‘In the ordinary partnership, each partner is bound for his share of the partnership debt, calculating such share in proportion to the number of the partners, without any attention to the proportion of the stock or profits each is entitled to.’
“It is certain that a partnership formed to drill oil wells comes within the definition of an ordinary partnership, above quoted. Perryman v. Boisseau, et al., 19 La.App. 43, 138 So. 141. Each member thereof is responsible only for the debts and obligations of such a partnership to the extent of his virile share, which is determined from the number of members and not by the extent of their interest or capital investment therein.”
*383 In the more recent case of Suckle v. Hartford Accident and Indemnity Company, 163 So.2d 564, (La.App. 2nd Cir. 1964), the court held that:
“A joint venture is one in which two or more persons combine their property or labor in the conduct of a particular line of trade or general business for joint profits, creating a status of partnership although facts do not show a formal partnership. Ault Wiborg Co. of Canada v. Carson Carbon Co., 181 La. 681, 160 So. 298 (1935); McCann v. Todd, 203 La. 631, 14 So.2d 469 (1943); Young v. Reed (La.App. 2 Cir., 1939) 192 So. 780 (cert. denied.)”
Another case holding that a joint venture in drilling and bringing in an oil well was an ordinary partnership was Posey v. Fargo, supra.
Thus we find that the drilling of the first new well and the old reworked well was a joint venture, treated as an ordinary partnership, and each party was jointly, but not in solido, liable for their virile share, not for their proportionate share of liability based on their contracted interest.
Defendants repeatedly question Duncan’s charges for supervision and the use of his rig. According to Duncan his charges were computed on the basis of $25.00 per day for supervision and a rental of $100.00 per day for standby time for the use of the rig. Gill contends there is nothing in the contract to justify such a charge nor did he at any time suggest or approve such a charge, nor was he aware of any such charge before Duncan’s statement dated October 1, 1959. Marshall Smith, an expert drilling contractor, called by plaintiff, testified that for this type of rig during 1959 and 1960 and considering the type of operation, the going rate was $150-$200 per day on a standby basis without a crew.
It is submitted that Duncan’s charges for the supervision and rental were reasonable and should be allowed on a quantum mer-uit basis. The standby charges were not included in the contract but have been proven by parole evidence.
The computation of the number of days for which standby time should be allowed presents a formidable problem. Gill was originally billed for 150 days, for the period April 18 through September 15, at $100 per day for a total of $15,000. Credits were allowed as follows: (1) $5,000 for the April 17th payment on account; (2) $5,630.82 for the note signed by Gill on July 7th; and (3) $2,800 for a credit for June 1-28, leaving a net balance of $1,-569.18. This was the figure billed to E. B. Duncan by E. B. Duncan Drilling & Well Servicing Company and which was in turn billed to Gill.
The computation of standby time as above shown is erroneous. Duncan could not charge standby time for the period from April 18th through May 21st since this period was covered by the $5,000 fee agreed upon in the written contract. Of the remaining days between April 18 through September 15 for which standby was charged, excluding the period June 1 through 28 which was credited previously, Duncan has filed drilling reports in evidence which show work was being performed and billed at an hourly rate for the period of May 22 through 31 and on July 24th. Thus our computation of possible standby time, based on Duncan’s drilling reports, is as follows: June 29 and 30; July 1-31, excluding July 24th; August 1-31; and September 1-14, when the rig was moved, for a total number of 77 days at $100 per day or $7,700 standby charges. From these charges the amount of the note, $5,630.82 is deducted, leaving a net charge of $2,069.18.
Although Duncan sought a recovery of $12,951.22, the expert appointed by the court found substantiating receipts, can-celled checks, etc., for $9,745.58, including the $1,569.18 for standby time above found erroneous. From this figure he deducted $406.83, representing the difference between payments made by Gill but not recorded by Duncan, thus determining that *384 Duncan was owed a net amount of $9,-338.75, which was substantiated and gave full credit to Gill for all payments actually made. Based on our computation of standby time from the record and the addition of $500 to the amount included in the expert’s report for standby time, we find that $9,838.75 is the amount that should be awarded Duncan in this case.
We will now consider the consolidated case 227 So.2d 386 on the $5,630.82 note given by Gill to Duncan on July 7, 1959.
Gill contended that this note was given in behalf of Baker, as was the $3,500 check he issued to Duncan on the same date, and the fact that the total of the two instruments was the exact amount that Duncan claimed Gill owed him on that date was merely a coincidence. The note was allegedly issued without consideration, as collateral to be used by Duncan in raising money and then it was to be returned to Gill. He also contended that if the note were given in payment of a joint venture obligation he could not be personally responsible for it.
The Commissioner dispatched with the idea of coincidence, lack of consideration, and a device issued to raise money in the following paragraph:
“Although the testimony introduced is conflicting, the evidence clearly shows that the note of $5630.82 along with a check for $3500 executed by Gill was given to Duncan at a time when the record shows that the total amount due was $9130.82. The purpose of the note was to assist in Squaring the account as of July 7, 1959. In executing and issuing such a note, defendant Gill acknowledged the full balance due as of July 7, 1959. He attempted to liquidate the indebtedness of $9130.82 in the form of his check for $3500 and his note for $5630.82. Such an acknowledgment or a settling up of an account constitutes in the Commissioner’s opinion lawful consideration for the promissory note.”
We find that Gill’s contentions of coincidence, lack of consideration, and device to secure credit are not serious defenses and that the note was issued by Gill in payment of the amount owed Duncan as of July 7, 1959 for the Mississippi drilling operation.
We now must determine whether Gill is to be personally liable for the note or whether it is a joint venture obligation and all parties are liable for their share.
Although the obligation which was credited for the amount of the note was a joint venture obligation arising out of drilling operations, the note given in payment therefor was an individual note with the word “Trustee” after the signature. The word “Trustee” without an indication of trustee for whom is merely descriptive and under LSA-R.S. 7:20 Gill is personally liable on the note. § 20 states :
“Where the instrument contains or a person adds to his signature words indicating that he signs for or on behalf of a principal, or in a representative capacity, he is not liable on the instrument if he was duly authorized; but the mere addition of the words describing him as an agent, or as filling a representative character, without disclosing his principal, does not exempt him from personal liability.”
Dayries v. Lindsly, 128 La. 259, 54 So. 791 (1911) the Supreme Court held that where a husband signed a note and added the word “agent” after his signature without disclosing his intended principal as his wife, he was personally liable. In Gayle-Blevins Lumber Co. v. Delhomme, 159 So.2d 355 (La.App. 3rd. Cir. 1963), the Court dealt with a note signed by officers of a corporation, one of whom had added the word “secretary” after his signature. The holder of the note was a party, present when it was drawn, and knew that the makers were officers of *385 the corporation as well as the owners. The Court there found:
“We believe the law expressed in the Dayries case, supra, is still the law of this state, and that where a person merely adds words after his signature, describing himself as an agent, or as filling a representative capacity, without disclosing his principal, he must be held personally liable as maker of the note; and parol evidence is not admissible, even as between the original parties, to show an understanding or agreement to the contrary.
He ‡ jfc j}i
“LSA-R.S. 7:20 provides clearly that the addition of words describing a person as an agent, or as filling a representative character (such as ‘secretary’), without disclosing his principal, does not exempt such person from personal liability. Any presumption or question to the contrary in this respect is negated by the act. To avoid being held personally liable as maker under the Negotiable Instruments Law, the defendants in the case before us on appeal would have had to avail themselves of the provisions of this section. Having failed to do so, they must be held personally liable as makers.”
In the present case Duncan knew that Gill was acting for himself and others but did not know who the other principals involved in the lease and drilling operation were. The note given by Gill did not disclose the names of those principals, the word “Trustee” was merely descriptive, and Gill is liable personally on the note.
There is an error in the trial court’s judgment in holding Gill personally liable for the total amount of the judgment and then ordering that each of the defendants was liable to Duncan for % each. As granted by the trial court, there are two judgments in favor of Duncan.
There is also apparently a clerical error in the computation of the number of defendants and their share of the judgment. The trial court granted a judgment of % of $12,951.22 or $1,493.02 per defendant. This is an error as there are only eight defendants. Also the date on the note is July 7th, not 9th, and the judgment should so read.
For the foregoing reasons, the judgment in No. 3623 in favor of E. B. Duncan d/b/a E. B. Duncan Drilling Contractor is amended to grant a recovery against G. Wray Gill, Dr. Fernando Carlomango, Alice Guilbeau Guidroz, Charles Quartar-aro, Theresa J. L. Lipman, Dr. William Fisher, Frank Dane and Mrs. Josie Marie Delaune, widow and testamentary executrix of the Succession of Dr. Nicholas J. Chetta, jointly, but not in solido, for their virile share of $9,838.75, plus legal interest thereon from the date of judicial demand, and all costs of these proceedings and as amended, is affirmed. The judgment in favor of Duncan and against Gill dismissing defendant’s reconventional demand at defendant’s cost is affirmed.
Amended, and as amended, affirmed.