386 F.2d 595
 KELLEY INVESTMENT CO., a Co-Partnership, Robert L. Kelley,
Frances J. Kelley, Gary L. Kelley, Adeline G.
Cressy, and Adeline G. Cressy, Trustee, Appellants,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED, Appellee.
 No. 18718.
 United States Court of Appeals Eighth Circuit.
 Nov. 29, 1967.
 
 Wm. E. Morrow, Jr., of Miller, Morrow & Woodward, Omaha, Neb., for appellant.
 Norman Krivosha, of Ginsburg, Rosenberg, Ginsburg & Krivosha, for appellee; Herman Ginsburg, of Ginsburg, Rosenberg, Ginsburg & Krivosha, Lincoln, Neb., on the brief.
 Before MEHAFFY and GIBSON, Circuit Judges, and STEPHENSON, District judge.
 MEHAFFY, Circuit Judge.
 
 
 1
 Merrill Lynch, Pierce, Fenner & Smith, Incorporated, appellee, brought suit against Kelley Investment Co., a Nebraska partnership, to recover losses sustained as a result of the latter's trading in the commodity market. Two separate causes of action were alleged and trial to a jury resulted in a verdict and finding in favor of Merrill Lynch. The judgment stemming from the second cause of action, growing out of a joint adventure account carried in the name of Paul Blood Farms, Inc., is the only one challenged by this appeal.
 
 
 2
 The judgments against appellants on both causes of action total $79,546.86, but upon the part challenged here the amount is $31,582.50, representing loss on the Paul Blood account involving the purchase and sale of thirty contracts of frozen pork bellies.
 
 
 3
 Diversity of citizenship, coupled with the requisite statutory amount in controversy, establishes jurisdiction. The substantive law of Nebraska controls. We affirm the judgment of the District Court.
 
 
 4
 The legal issues present the question of sufficiency of the evidence to sustain the jury's verdict that a joint adventure existed between Kelley and Paul Blood Farms, Inc.; and, if so, whether the amount of damages awarded by the court is correct.
 
 
 5
 Merrill Lynch alleged in its second cause of action that in the early part of March, 1964, Paul Blood Farms, Inc. and Kelley entered into a joint adventure to be carried on in the name ofPaul Blood Farms, Inc. and to be handled by Merrill Lynch as broker. The joint adventure purchased the following frozen pork bellies on the Chicago Commodity Exchange for August delivery:
 
 
 6
 March 23, 1964-- 5 contracts @ $28.27;
 
 
 7
 March 24, 1964-- 5 contracts @ $28.10;
 
 
 8
 April 17, 1964-- 10 contracts @ $29.15;
 
 April 20, 1964-- 5 contracts @ $28.92; and
 
 9
 April 21, 1964-- 5 contracts @ $28.80.
 
 
 10
 Each contract was for 30,000 pounds or an aggregate of 900,000 pounds and the prices quoted above were per hundred-weight.
 
 
 11
 Merrill Lynch further alleged that on or about June 4, 1964 the joint adventure notified it to liquidate the contracts which resulted in a deficit in the amount of $37,380.00 and prayed for judgment in this amount together with interest from the fourth day of June, 1964.
 
 
 12
 Kelley denied that there was a joint adventure with Paul Blood Farms, Inc., asserting that under the terms of the agreement he merely purchased from Blood a one-half interest in the contracts. Kelley admitted that he paid the initial margin of $350.00 per contract on all thirty contracts and also that he was to share in the profits and losses, but denied that he had any right to exercise control over the sale or trade in connection with said contracts, asserting that this right was exclusively that of Paul Blood.
 
 
 13
 Paul Blood and Robert L. Kelley had been personal friends for some thirty-five years, had taken trips together and had engaged in other business dealings together. Blood was experienced in trading in the frozen pork belly market and they agreed to speculate, with Kelley putting up the money and Blood doing the trading. After purchase of the thirty contracts, the market declined, Blood began having financial difficulties, and some of his checks were not honored. Kelley went to see Blood at his home and obtained an agreement from him to sell the thirty contracts. Kelley, from Blood's home, gave the sell order to Merrill Lynch over the telephone, but Merrill Lynch refused to liquidate the account except on orders from Blood as it had no knowledge at that time of the joint adventure. Mr. Blood was upset and unable to come to the telephone but upon assurance from Mrs. Blood that he had agreed to have the account liquidated, Merrill Lynch did so.
 
 
 14
 Kelley does not question the correctness of the court's charge in defining joint adventure. Paraphrasing the court's charge, joint adventure was characterized as an agreement to enter into an undertaking or enterprise in which the parties have a community of interest and common purpose in the performance of the objects thereof, and in which each of the parties must have equal voice in the manner of its performance and control over the agencies used therein, although one party may entrust performance to the other.
 
 
 15
 Kelley argues that Merrill Lynch's refusal to act on its orders to liquidate the account is proof that Kelley did not have equal control over it. At the time of this occurrence, however, Merrill Lynch had no knowledge of the joint adventure. Kelley admitted on the witness stand that he had delegated authority to manage the trading to Blood, but he felt he had a right to talk with Blood about selling the contracts and thought Blood would listen to him. He further testified that he put up all the money and had agreed to put up any margin maintenance in its entirety and he felt he had the right, if he so desired, to quit putting up any margin.
 
 
 16
 The existence or nonexistence of a joint adventure is a question of fact for the jury's determination, although what constitutes a joint adventure is a question of law. 48 C.J.S. Joint Adventures 16 (1947). Kelley cites what appears to be the leading Nebraska case defining joint adventure, Soulek v. City of Omaha, 140 Neb. 151, 299 N.W. 368 (1941). In this opinion, the Nebraska court elaborately discusses and defines a joint adventure using substantially the same phraseology contained in the court's instruction in the case before us. Noting that a joint adventure as a legal concept is purely the creation of our American courts and is in the nature of a limited partnership, the Nebraska court states in Soulek, supra at 372:
 
 
 17
 '* * * The courts have generally held that to constitute the relationship there must be an agreement to enter into an undertaking in the objects of which the parties have a community of interest and a common purpose in performance, and each of the parties must have equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other.'
 
 
 18
 After reviewing the entire definition on the subject and citing a number of cases and text writers, the Nebraska court further says:
 
 
 19
 'In view of the foregoing and other authorities, it is apparent that the relationship depends largely upon the legal intent as manifest from the facts and circumstances involved in each particular case.' 299 N.W. at 372.
 
 
 20
 It is appropriate to borrow the language of Judge Matthes of this court who, in the recent Iowa case of Dubuque Stone Products Co. v. Fred L. Gray Co., 356 F.2d 718, 721 (8th Cir. 1966), after quoting the Iowa Supreme Court's definition that a joint adventure is 'an association of two or more persons to carry out a single business enterprise for profit,' or 'a common undertaking in which two or more combine their property, money, efforts, skill or knowledge,' makes the following observation:
 
 
 21
 'The Iowa court's expression seems to be in accord with the generally recognized and accepted definition and characterization of a joint venture. See, 48 C.J.S. Joint Adventures 1, 2 and 5a; 30 Am.Jur., Joint Adventures, 6, which contain detailed discussions of the law in this area.'
 
 
 22
 We find that the Nebraska court's expression in Soulek and the court's instruction given in the instant case are likewise in accord with the generally recognized and accepted definition of joint adventure.
 
 
 23
 In cases such as the one before us, where the agreement is oral, it is not always easy to prove a joint adventure, but we have no difficulty in determining that the evidence in this case sufficed to support the jury's conclusion that a joint adventure existed between the parties. Admittedly, there was an agreement to combine the money contributed by Kelley with the skill and knowledge of Blood in the common enterprise or joint undertaking of speculating in the commodity market by buying futures in frozen pork bellies for their mutual benefit. They agreed to share the profits and losses; and, although Paul Blood was entrusted with the trading because of his particular skill and knowledge, there was also mutuality of control by the joint adventurers as evidenced not only by Kelley's admissions from the witness stand but by their mutual agreement to liquidate the contracts. Thus, the evidence is clear that all the essential elements of a joint adventure existed.
 
 
 24
 Kelley next contends that Merrill Lynch did not sufficiently and accurately establish the amount of loss or damages to which it was entitled. It is asserted that the thirty contracts were carried in the Paul Blood Farms, Inc. account together with some one hundred other contracts and that all were so commingled that they could not be identified. From this premise it is contended the owners became tenants in common of the commingled mass and any loss therein should be shared in proportion to their contribution to the mass. Further, it is argued that Merrill Lynch had a duty to produce evidence concerning the total loss sustained on the entire account which it failed to do. The record evidence does not support this argument. Merrill Lynch specifically identified the thirty contracts hereinabove described; produced undisputed evidence of the cost price of each contract and the sales price of each contract; and, therefore, the loss was readily and clearly ascertainable. The cases cited by Kelley of commingling of property have been considered by us and found to be factually inapposite.
 
 
 25
 Finally, Kelley contends that if it is found that a joint adventure existed, three of Kelley's checks totalling $27,690.00, which were endorsed over to Merrill Lynch by Paul Blood Farms, Inc., should be applied against the debt created by the purchase of the thirty contracts here involved. Two of Kelley's checks were made payable to Apul Blood Farms, Inc. and the third, in the amount of $4,500.00, to Merrill Lynch, but all of them were endorsed by Apul Blood Farms, Inc. and delivered by Paul Blood to Merrill Lynch. The court applied $10,500.00 of the payments made by Paul Blood Farms against the thirty contracts, which represented the $350.00 margin required for the purchase of each contract. Kelley contends that since these three checks were issued after the date of the purchase of the thirty contracts, it is obvious that they were payments in addition to the initial margin deposits. They quote from St. Paul Fire & Marine Ins. Co. v. United States, 309 F.2d 22, 25 (8th Cir. 1962), wherein Judge Blackmun summarized the law of application of payments by a debtor to a creditor, as follows:
 
 
 26
 '(i) The payment is applied as the debtor intends and so manifests to the creditor before or at the time of the payment.
 
 
 27
 (ii) If the debtor fails so to indicate, the payment is applied as the creditor, within a reasonable time, determines.
 
 
 28
 (iii) If neither the debtor nor the creditor seasonably so indicates, the payment is applied as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied. This usually results in its application to the oldest unsecured account.
 
 
 29
 (iv) If the debtor is under a duty to a third person to devote funds paid by him to the discharge of a particular debt, the payment must be so applied if the creditor knows or has reason to know of that duty. This is so despite the debtor's contrary direction.'
 
 
 30
 We fail to see how the above rules in any way support Kelley's contention that under the facts here it is entitled to have the amount of these checks credited against the losses sustained on the thirty contracts. Merrill Lynch did not know that a joint adventure existed between the parties and was under no duty to appellants with respect to the manner in which it credited any funds received by it from Paul Blood Farms, Inc. No specific instructions were given, up to and including the time of trial, and, therefore, under Rule ii above, Merrill Lynch had the right to determine how the payments would be applied. See in this connection Fox v. Carman, 139 Neb. 34, 296 N.W. 343 (1941). Actually, Kelley never contended that when the checks were given they were intended to be applied upon the purchase price of the thirty contracts. All that had to be paid on the contracts until the August delivery was the $350.00 initial margin and any margin maintenance required. Mrs. Adeline Cressy, who kept books for Kelley, testified that on instructions from Mr. Robert L. Kelley she had been exchanging checks on the Kelley Investment Company account with Mr. Blood, but she didn?'t know the reason. The purposes for which the three checks here involved were given were never satisfactorily explained.
 
 
 31
 We hold that there is no merit to appellants' contention that the three checks in controversy should be applied against the losses sustained in the joint adventure.
 
 
 32
 The judgment is affirmed.