262 So.2d 350

**GRAND ISLE CAMPSITES, INC.**

v.

**Richard E. CHEEK and Edward V. Fetzer.**

**No. 51647.**

May 1, 1972.

Rehearings Denied June 5, 1972.

Sandoz, Sandoz & Schiff, Lawrence B. Sandoz, Jr., Dubuisson & Dubuisson, James T. Guglielmo, Opelousas, for plaintiff-relator.

Breazeale, Sachse & Wilson, Frank P. Simoneaux, Seale, Smith & Phelps, Donald S. Zuber, Edward V. Fetzer, Baton Rouge, for defendants-respondents.

HAMLIN, Justice:

In the exercise of our supervisory jurisdiction, we directed Certiorari to the Court of Appeal, First Circuit, for review of its judgment which affirmed the judgment of the trial court in favor of defendants in this action for the return of an alleged secret profit of $125,000.00. Art. VII, Sec. 11, La.Const. of 1921; 249 So.2d 268; 259 La. 767, 252 So.2d 666.

This proceeding was instituted by Grand Isle Campsites, Inc. July 19, 1968, against Richard E. Cheek for the recovery of a secret profit allegedly made by Cheek while

he was allegedly acting as a de facto promoter and director and stockholder of plaintiff corporation. The action is based on breach of trust and violation of a fiduciary relationship. By supplemental petition, Cheek's lawyer, Edward V. Fetzer, was named as a defendant; also by third party petition, Fetzer joined his professional liability insurers, Continental Casualty Company and St. Paul Fire and Marine Insurance Company.

We have read the lengthy testimony of record and find that the Court of Appeal correctly summarized it in substance as follows:

"Mr. Cheek discovered during the summer or fall of 1967 that Humble Oil Company owned certain undeveloped land at Grand Isle, Louisiana, and that Humble would sell it for $275,000.00. He acquired this information through Mr. George Singelman and the latter's close friend Harvey Condron who worked in the land office of Humble Oil. Through a friend of Mr. Cheek, one E. J. Cote, three businessmen from Opelousas learned of the availability of the land and expressed an interest in participating in the development venture. These three included Mr. H. J. Danel and Mr. C. J. Ryder (co-owners of a general contracting firm Danel-Ryder, Inc.) and Mr. S. S. Tomlinson, president of the St. Landry Bank and Trust Company of Opelousas.

"Essentially, Mr. Cheek informed the other three men that he had obtained an option to purchase the property for $400,-000.00. After several meetings, examinations of maps and aerial photographs, and two visits to Grand Isle, the four men decided to form a corporation to purchase and develop the property, with each man having a 25% interest. The purchase price of $400,000.00 was agreed upon by all after they had reviewed sales of comparable property in the area. Although Mr. Cheek had previously caused the name Grand Isle Development Corporation to be reserved with the Secretary of State, the men decided to form a new corporation under the name of Grand Isle Campsites, Inc., the plaintiff herein, and Mr. Tomlinson undertook the preparation of the articles of incorporation, other necessary papers and the arrangements for loans of $200,000.00 each from Capital Bank and Trust Company in Baton Rouge and First National Bank of Lafayette. Although the reason therefor is disputed, Mr. Cheek's name was omitted as an incorporator, officer, director or shareholder when the corporation came into existence on January 18, 1968, but it was understood that he would eventually be given a 25% interest in the stock. In fact, at a directors' meeting on March 12, 1968, Cheek was made a director and one-fourth owner, by resolution. Mr. Cheek assigned to the corporation his rights in what purported to be

an option to purchase the property for $400,000.00 from George Singelman dated October 15, 1967. (There was conflicting testimony on this point. Mr. Singelman said he received a check for $10,000.00 from Mr. Cheek for the option and gave it to Mr. Condron in Humble's land office but the check was never negotiated and was eventually returned to Mr. Cheek. However, Mr. Condron stated that Singelman never had an option to purchase from Humble and that he never received a check from either Singelman or Cheek.) Nevertheless, Humble sold the property to Singelman by deed dated January 25, 1968, for a consideration of $275,000.00, although the actual transfer was not made until the morning of January 30, 1968, when the price was paid by a check drawn on the account of Richard E. Cheek, Inc. That afternoon, Singelman sold the property to the plaintiff corporation for $400,000.00. The two notes for $200,000.00 each were signed by Danel, Ryder, Cheek and Tomlinson, representing the debt for the bank loans. Thus, it is immaterial whether Singelman ever had an option to purchase from Humble and whether there was a basis for the option from him to Cheek, since Singelman did in fact buy the property and sell it to the plaintiff as assignee of Cheek's purported option from him, Singelman.

"The following joint stipulation was made a part of the record:

" 'Richard E. Cheek, Inc., gave its check for $275,000.00 to Humble Charitable Trust and Harvey Condron of Humble Charitable Trust gave a deed to the Grand Isle property in question. The deed to George Singelman is dated January 25, 1968. The consideration recited is $275,000.00. On January 30, 1968, the property was sold by George Singelman to Grand Isle Campsites, Inc., for $400,000.00. Richard E. Cheek received the $400,000.00 proceeds.'

"Mr. Singelman admitted that he had not paid anything to Humble for the property and was in fact a 'go-between' in the transaction.

"[1] Defendant Fetzer became involved when the principals in the venture were discussing an attorney who would handle the legal aspects of the transfer to the corporation which was to be formed. Mr. Tomlinson suggested Mr. Jules Landry, a Baton Rouge attorney, but then learned from him that he did not have the time to perform the necessary work by January 30, 1968, when the sale was to take place. Mr. Cheek informed the others that his attorney, Edward V. Fetzer, had already done some work for him and was familiar with the matter, and that since Fetzer owed Cheek some favors he would prepare the necessary documents without charge to the corporation.

"Mr. Fetzer handled the assignment to the corporation of Cheek's option from

Singelman. He notified Mr. Condron of Humble's land office that Singelman rather than Grand Isle Development Corporation (which was never formed but was only a name reserved with the Secretary of State) would be named as vendee in the sale from Humble Charitable Trust. At Mr. Tomlinson's request, Mr. Fetzer prepared the act of sale from Singelman to the corporation, the mortgage from the corporation to the Lafayette bank, a mortgagee's title opinion and the necessary corporation minutes and resolutions. He assured Tomlinson, Danel and Ryder that the title which they acquired was good and merchantable and that the sale was in all respects valid. He deposited the corporation's check for $400,000.00 in his 'client's account' and issued a check in a like amount to Singelman, who endorsed it payable to the order of Richard E. Cheek. Cheek then deposited that check to cover the check for $275,000.00 which he had given to Humble Charitable Trust earlier in the day."

Both the trial court and the Court of Appeal found that at the time Cheek made the instant profit, he was neither a promoter nor a stockholder and director of the plaintiff corporation; they also absolved Fetzer of liability. Although he dismissed plaintiff's demands against defendants (he also dismissed Fetzer's demands against St. Paul Fire and Marine Insurance Company and Continental Casualty Company as being moot), the trial judge made the following philosophical observation:

"Basically, the powers of this Court are limited to findings of facts from the evidence, and the law applicable thereto. We are not in any sense a censor of moral or ethical business practices of parties litigant. We must not confuse moral reprehensibleness with legal culpability. The arcane arts of 'high finance' ofttimes appear to the uninitiated, such as the writer of this opinion, dark and devious. However, in the absence of constitutional or statutory interdiction of such practices, they are beyond the reach of judicial restraint."

At the behest of plaintiff we granted Certiorari; it assigns the following errors to the judgment of the Court of Appeal:

"1. The Court erred in failing to find that Richard E. Cheek was a de facto director, promoter or otherwise with a corresponding fiduciary duty to the corporation, the relator submitting that Cheek signed notes for $400,000.00 simultaneously with the sale in question; agreed with the others that he would be a one-fourth 'partner'; issued his check for $250.00 representing one-fourth of the paid-in capital; issued another check for $1,000.00 representing his one-fourth portion of the working capital the corporation would require; negotiated the

sale from Humble to the party interposed, Singelmann; had Fetzer prepare or review some of the legal instruments in question; secured comparables of the land and projected profit to be made; made numerous trips to 'sell' the corporation to the prospective investors; submitted the name of Fetzer as attorney to represent the corporation; represented that through 'political connections' he would obtain improvements, and in fact had commitments for improvements of the property; that Cheek did other things, all of which presents a novel issue due to the paucity of jurisprudence in the United States (practically none in Louisiana) as to the obligations and extent that individuals closely related thereto may participate and profit to the detriment of a corporation.

"2.  The Court erred in failing to find that Edward V. Fetzer owed a duty as attorney or notary to disclose what he knew about Cheek's intentions to make a profit, if personnel of the corporation were reasonably led to believe that Fetzer was acting as an attorney on behalf of the corporation, and if so, to what extent was the attorney and notary obligated to divulge information to officers of the corporation in connection with the purchase of realty by a corporation wherein the attorney prepared an act of sale; an act of collateral mortgage; a title opinion; was involved as attorney in the transaction whereby Cheek sought to purchase the property from Humble, prepared an assignment by Cheek to the corporation; reviewed the deed from Humble of January 26, 1968, participated in the substitution of the proposed vendee to the name of 'Singelmann' by letter to Humble of January 26th; and prepared waiver of notice of the directors' meeting, minutes authorizing the sale and the mortgage of the corporation in question."

We agree, for reasons stated infra, with the finding of the two lower courts that the defendant Fetzer is not responsible to plaintiff for violation of a fiduciary relationship.  However, we find that defendant Cheek's status was quite different from that of his co-defendant; Cheek was clothed with a fiduciary relationship and occupied a position of trust.

Article 2164 of the Code of Civil Procedure provides that an appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.  The Official Revision Comments under the article state that it, the article, insures that the "theory of a case" doctrine is not applicable to appeals under the Code.  (This matter is now being considered by this Court as though it were on appeal.)

Neither the trial court nor the Court of Appeal made a determination as

to whether the doctrine of Joint Venture or Joint Adventure is applicable to Cheek and the incorporators of Grand Isle Campsites, Inc. A study of the doctrine and the facts supra as well as the facts found by the trial court[1] compels us to conclude that Cheek and Grand Isle Campsites, Inc.'s incorporators were joint adventurers.

1. The trial court found that:

"Cheek, with hopes of further generating Tomlinson's interest in the Grand Isle property, visited Tomlinson at his offices in Opelousas and attempted to sell Tomlinson on the idea that an investment in property at Grand Isle for development purposes would be a profitable business venture. This meeting occurred in November or December, 1967.

"Tomlinson testified that Cheek, 'was trying to possibly sell this property. To interest me and the others in acquiring it.' (TR 203)

"Cheek also told Tomlinson that he had already started negotiating for the property and that he had 'cut a deal' to have utility lines run to the development, have the roads covered with shell and asphalt, and to have the low-lying areas filled with soil from a canal that the Corps of Engineers was to build on the rear of the Island.

"But Mr. Tomlinson would not be stampeded into a hasty decision. He told Cheek that he needed more information before making a decision and asked Cheek to furnish comparables on other property sold at Grand Isle.

"In an effort to further investigate the desirability of the Grand Isle property, Danel, Ryder and Tomlinson met Cheek at Grand Isle during the second or third week of January, 1968 and saw first hand the land which was available. On the return trip, the parties, Cheek, Tomlinson, Danel, and Ryder agreed to form a corporation to acquire and develop the Grand Isle property. At this point there was approximately 241.5 acres of land available. Cheek told the other three gentlemen that the property was available for $400,000.00. He conveyed to them that he had an option to purchase the land from Humble Companies Charitable Trust at this price. The facts indicate that Cheek in fact had an option to purchase this property from George Singelmann, who in turn had an option to purchase from Humble for $275,000.00 for on October 15, 1967, Cheek tendered a check to Singelmann for $10,000 for an option to purchase the Grand Isle property for $400,000.00. However, this check for $10,000 was never negotiated by Singlemann but was simply held to secure the agreement.

"It was also generally agreed as to what the various responsibilities of those involved would be. Tomlinson would set up the corporation and arrange financing. Danel and Ryder would engage in their particular sphere of expertise—clearing of the land and construction. Cheek was to follow through with having roads shelled, water provided, and utility lines run. He was also to engage in general promotion of Grand Isle property with an end toward promoting the sale of campsites on the island. It was further agreed that none of those involved would attempt to claim a profit from these various endeavors until the loans made to acquire the property had been repaid."

Cheek gave the following testimony:

"Q. At that time did Mr. Tomlinson tell you, 'Check, we know you have some time in this. Now what do you want and what do you expect out of this corporation or out of this deal.' Do you recall that inquiry being made?

"A. I don't recall those exact words. My recollection was a discussion came up about what we were to derive from the business and it was understood and agreed among us that no one would receive any salary or anything until the corporation had paid off its indebtedness.

"Q. Did Mr. Tomlinson tell you that he didn't want to go into it if anyone was to make any profit?

"A. No.

"Q. You deny that?

"A. I deny that."

In the early case of Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228 (1930), this Court discussed Joint Adventure at length as follows:

"Joint adventure, as a legal concept, is of comparatively recent origin, and is the creature of American courts, 33 C.J. p. 841. The concept has received some recognition in this state. Ludeau v. Avoyelles Cotton Co., Inc., 164 La. 275, 113 So. 846; Doane v. Adams & Co., 15 La.Ann. 350.

" 'A joint adventure has been aptly defined as a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' 33 C.J. p. 841. A joint adventure has also been defined as 'An association of two or more persons to carry out a single business enterprise for profit.' Fletcher v. Fletcher, 206 Mich. 153, 172 N.W. 436, 440. It has been held that a corporation may be a member of a joint adventure, the purposes of which are within its corporate powers. Tusant & Son Co. v. Chas. Weitz Sons, 195 Iowa 1386, 191 N.W. 884. The relations between joint adventures are assimilated to those of partners inter se. Ludeau v. Avoyelles Cotton Co., supra. As respects the character of the business undertaken, the principal difference between a partnership and a joint adventure 'is that, while a copartnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years.'

"As to the duration of the association: 'If no date is fixed by the contract for the termination of the adventure, or its termination is dependent upon the happening of a contingency, the agreement is usually constituted to remain in force until the purpose is accomplished, or the contingency has happened, and neither party can, without just cause, terminate the adventure until that time.' 33 C.J. p. 849. However, this is not always the case, for 'Where the contract contemplates a series of business ventures, such as buying and selling corporate stocks or bonds, or real estate on speculation, and there is no time limited for the continuance of the enterprise, it is usually held that the contract is terminable at will by any party to it.' 33 C.J. p. 849. In fact, it has been held that a joint adventure is subject to the same rules, regarding its duration, as a partnership. Hardin v. Robinson, 178 App.Div. 724, 162 N.Y.S. 531, affirmed by memorandum decision, 223 N.Y. 651, 119 N.E. 1047." See Duncan v. Gill, La.App., 227 So.2d 376; cert. denied, 255 La. 338, 230 So.2d 834, 835; Fossier v. American Printing Co., Ltd., La.App., 130 So.2d 529.

In Villarrubia v. Roy, 162 So.2d 86 (1964) the Court of Appeal stated:

"Joint ventures are similar to partnerships and generally are governed by the same rules and principles. One of the elements of a joint venture is a mutual participation in the profits. LSA–C.C. Arts. 2801, 2811; Little v. Haik, La.App., 154 So.2d 507; McCann v. Todd, 203 La. 631, 14 So.2d 469; Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228; 25 Tul.L.Rev. 382, 383, 387. * * *"

In 46 Am.Jur.2d Joint Ventures, we find the following:

*"Sec. 7 Generally.*

"There appears to be substantial agreement that in order to constitute a joint venture, the following factors must be present: a contribution by the parties of money, property, effort, knowledge, skill, or other assets to a common undertaking; a joint property interest in the subject matter of the venture and a right of mutual control or management of the enterprise; expectation of profits, or the presence of adventure; a right to participate in the profits; and, usually, a limitation of the objective to a single undertaking or ad hoc enterprise. No specific or formal agreement is required. Whether persons have entered into a joint venture depends largely upon the terms of the particular agreement, upon the construction which the parties have given it, as indicated by the man-

ner in which they have acted under it, and upon the nature of the undertaking, as well as upon other facts. [pp. 27, 28]

" * * *"

*"Sec. 17. Purchase and sale of real property.*

"The relation between the parties to a contract under which they are to join in the purchase of land, each to pay an equal share, or a proportionate share, of the purchase price, and afterward to sell the land and share the profits equally or in proportion to their interest therein, is that of joint venturers, with obligations of fidelity, fair dealing, and truthfulness between them. * * * [p. 38]

" * * *"

*"Sec. 50. Generally.*

"The relationship between joint venturers, like that existing between partners, is fiduciary in character and imposes upon all the participants the obligation of loyalty to the joint concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise. * * *

"The fiduciary relation upon which such obligations are consequent does not necessarily await the inception of the relationship of joint venturers. It may be predicated upon an arrangement to assume such a relationship. Thus, it is the plain and imperative duty of promoters of a syndi-

cate, toward persons who are invited to co-operate in the enterprise, not only to abstain from stating as a fact that which is not a fact, but not to omit to state any circumstances within their knowledge the existence of which might in any way affect the extent or quality of the advantages held out as inducements to the others. [pp. 69, 70]

" * * * "

"Sec. 51. *Individual or private advantage.*

"As long as a joint venture is in existence, a joint venturer cannot act for himself. Both the requirement of good faith between joint venturers and the principle that a joint venture contemplates a division of all the profits growing out of the transaction among all the venturers forbid one coventurer from acquiring and retaining for himself any private or secret advantage in connection with the common enterprise. Profits wrongfully diverted from a joint venture are subject to a constructive trust, and any profits realized from self-dealing belong to the venture. The same rule applies to promoters and members of syndicates. [p. 71]

" * * * "

"Sec. 52. *Misrepresentation as to cost.*

"Where one of the parties to a joint venture or a syndicate obtains a profit by misrepresentations as to the cost of property related to the enterprise, it is well settled

that he has breached the fiduciary relationship and must account to his associates for such profit. Thus, where certain of the parties to a joint venture made a secret profit by representing that an option had been obtained for land at a certain price when in fact it was secured by one of the parties for a lower price, and such representation was relied upon by other parties entering into the agreement for the purchase of the land jointly, such conduct was held to constitute actual fraud, entitling the other to an accounting. * * * [p. 72]

" * * * "

The existence or nonexistence of a joint adventure is a question of fact, although what constitutes a joint adventure is a question of law. Kelley Investment Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 8 Cir., 386 F.2d 595 (1967).

Herein, during January, 1968 when Cheek, Danel, Ryder, and Tomlinson agreed that they would purchase the instant land—Cheek told Danel, Ryder, and Tomlinson that it could be secured for $400,000.00 and indicated that he had an option—a joint venture came into definite existence among the four parties. Tomlinson, who later became president of plaintiff corporation, believed in Cheek; he, Tomlinson, was primarily instrumental in forming Grand Isle Campsites, Inc., January 18, 1968, for the purpose of dealing in

lands and leaseholds. The joint venture thus continued during early 1968 between Cheek and plaintiff corporation—then composed of Danel, Ryder, and Tomlinson.

The act of sale of January 30, 1968 from George Singelmann to Grand Isle Campsites, Inc. was signed by Singelmann and Tomlinson, but it was witnessed by Cheek and Ryder. The $400,000.00 check made payable to George Singelmann was endorsed by Singelmann "Pay to the order of Richard Cheek." It was then signed by Richard E. Cheek and negotiated. Cheek endorsed a $200,000.00 demand note payable to the First National Bank of Lafayette, Louisiana, interest commencing February 1, 1968; he also endorsed a $200,-000.00 demand note payable to Capital Bank & Trust Co., Baton Rouge, La., Febraury 1, 1968.

Unknown to the incorporators of plaintiff, Cheek gave the check of Richard E. Cheek, Incorporated to Humble Companies Charitable Trust for $275,000.00. The check is dated January 39 [29], 1968. This check covered the purchase price of the instant land from Humble to George Singelmann.

Cheek paid $250.00 into the corporation as his one-fourth part of the initial paid in capital. Cheek admitted that on May 22, 1968 he made a check payable to Grand Isle Campsites, Inc. for $6,000.00, his pro-rata part of developing costs and other

things. With respect to Cheek's money contributions, Mr. Tomlinson testified:

"Q. What was the purpose of that check?

"A. This is in payment of Mr. Cheek's interest in the stock of Grand Isle Campsites Incorporated.

"Q. What was to be the total value of your Corporation?

"A. One Thousand Dollars.

"Q. And this was his one-fourth contribution to the Corporation?

"A. This was his one-fourth contribution, yes sir.

"Q. Now there is no date on that check —when was that check given to you by Mr. Cheek?

"A. The same date that we gave him that check for $10,000.00—January 17th to my recollection.

"Q. 19—

"A. —68.

"Q. Did you receive any other checks from Mr. Cheek?

"A. Yes sir.

"Q. Do you have that check with you?

"A. Yes, I received another check.

"Q. All right, the first check is 8103 and this check is 8104—

"A. Yes sir.

"Q. —Drawn on the same account—the same bank—

"A. —Yes sir.

"Q. What was the sum of that check?

"A. That check was in the amount of One Thousand Dollars.

"Q. When was that given to you?

"A. The same date—January 17, 1968.

"Q. What was the purpose of that check?

"A. We decided on the return trip from Grand Isle that we would place money in this Corporation as need for various purposes. We agreed on that trip that we would each place into the Corporation in addition to $250.00, $1,000.00 apiece.

"Q. That $1,000.00 would be for say, working capital?

"A. That would be used for working capital yes sir.

"Q. This was done before January 30, 1968?

"A. Yes sir."

We conclude that Cheek's actions supra were deceptive. Tomlinson, Danel, and Ryder believed that the corporation was to be and thereafter was all for one and one for all. During March, 1968 when plaintiff made Cheek a director of Grand Isle Campsites, Inc. and a one-fourth owner of the corporation's stock,[2] Cheek made neither objection nor revelation. (A few months later the three incorporators learned of Cheek's alleged hidden profit and instituted the present action.) The testimony is uncontradicted that Danel, Ryder, and Tomlinson at the time of the purchase from Singelmann had no knowledge that a profit was being made by Cheek. We conclude, as stated supra, that Cheek breached the trust placed in him by his joint adventurers and violated his fiduciary relationship. Having found that a joint venture exists herein and that Cheek was a joint adventurer, we conclude that he must be held responsible for the undisclosed profit that he made.

In absolving Fetzer of liability, we adopt as our reasons the following of the Court of Appeal: "Defendant Fetzer's role in the transaction has already been described. Plaintiff contends that his failure to disclose to its officers that Cheek was making a profit should make him liable for the amount of that profit. It is argued that Fetzer's duty to disclose the information arose out of an attorney-client relationship created when Cheek retained Fetzer to prepare the necessary documents and pass the act of sale from Mr. Singelman to the corporation.

"Mr. Fetzer responds that everyone knew he was Cheek's personal attorney

2. It was stated in argument that Cheek did not physically receive the stock.

and had worked previously for him in connection with the subject property. He denied that he was 'representing' the corporation or anyone else in passing the sale. At Mr. Cheek's request, he merely followed Mr. Tomlinson's instructions relative to the preparation of the documents and truthfully assured the parties that the sale was valid and the title good and merchantable, which was all he had been requested to do. Assuming for the sake of argument that, since the corporation did receive a benefit from Fetzer's work, an attorney-client relationship did exist, nevertheless the scope of Fetzer's responsibility is limited by the express understanding between him and the corporation's officers. He was not called upon to give his opinion as to the wisdom of the venture, the reasonableness of the price or any other affairs of the corporation. All of those matters had been settled to the satisfaction of all concerned prior to his involvement in passing the act of sale and it was unimportant to him, for the purposes of his work, how such agreements had been reached. The attorney-client relationship is contractual in nature and is based upon the express agreement of the parties as to the nature of work to be undertaken by the attorney. The agreement or consent of an attorney to perform work for a party on a particular matter or transaction does not create an attorney-client relationship as regards other business or affairs of the client. Delta Equipment and Construction Co. v. Royal Indemnity Co., 186 So.2d 454 (1st La. App., 1966). As noted by the trial judge, it is not the duty of an attorney who is retained to check a title on property and pass an act of sale to investigate the preliminary negotiations of the parties and involve himself in questions of how the parties arrived at the stated price."

For the reasons assigned, the judgment of the Court of Appeal, First Circuit, is reversed and set aside insofar as it dismisses plaintiff's demands against Richard E. Cheek; it is now ordered, adjudged, and decreed that there be judgment in favor of Grand Isle Campsites, Inc. and against Richard E. Cheek in the sum of One Hundred Twenty Five Thousand and no/100 Dollars, plus legal interest from date of judicial demand, until paid. The judgment of the Court of Appeal in favor of Edward V. Fetzer is affirmed. All costs to be paid by defendant Richard E. Cheek.

McCALEB, C. J., subscribes to the ruling that Cheek is liable but dissents from the holding exonerating Fetzer, being of the view that the latter violated his fiduciary relationship with his clients in failing to disclose that his personal client, Cheek, had a secret deal to make $125,000 (of which Fetzer received $25,000) at their

expense. When Fetzer accepted employment from the joint ventures, his private dealings with Cheek should have ended insofar as the instant transaction was concerned.

BARHAM, J., concurs in part and dissents in part with written reasons.

DIXON, J., concurs as to Cheek and dissents as to Fetzer.

BARHAM, Justice (concurring in part and dissenting in part).

I concur in the majority's finding that Cheek breached a fiduciary duty to the plaintiff and that he should be cast in judgment for the profits he made on the land sale to the plaintiff. I dissent from the majority's absolving Fetzer, an attorney, from responsibility and liability. Fetzer entered into an attorney-client relationship with plaintiff. His representation of Cheek and the plaintiff simultaneously in these matters presents a conflict of interest which could not be resolved or evaded. He breached a duty owed by an attorney to his client when he undertook the representation of plaintiff without disclosure of special knowledge he had regarding the fiduciary breach of Cheek. Fetzer's breach of his attorney-client duty to plaintiff should cast him solidarily with the defendant Cheek.