BAILES, Judge
(dissents).
I am of the opinion the majority opinion is wrong. These are my reasons:
The plaintiff-appellant, a judgment creditor of E. J. McCarthy and McCarthy Construction Company, Inc., (collectively referred to as McCarthy), appeals from the judgment of the trial court refusing to make absolute a rule on Tonti Management Corporation (Tonti) issued in a summary proceedings by plaintiff to traverse the answers of Tonti in a granishment proceedings.
The interrogatories propounded to Tonti made inquiry of the possession by Tonti of any money, rights, credits, or other property whatsoever belonging or due to McCarthy, and if so, the amount thereof. The interrogatory was answered by Tonti through its legal counsel, Mr. Patrick E. Carr, in the negative. It was this negative or, “No.” answer of Tonti that provoked the plaintiff to traverse. It is the contention of Tonti that it held no funds or other property whatsoever that belonged to McCarthy. I find the answer of Tonti was not truthful and that Tonti did have in its possession and under its control an amount of money much in excess of the amount required to satisfy the judgment of the plaintiff which was sought to be seized under the writ of fieri facias issued thereon.
The facts are. that on September 15, 19/1, plaintiff obtained a judgment in the amount of $3,652.37, against E. J. McCarthy, Sr., and McCarthy Construction Company, Inc., plus eight (8%) per cent of the principal and interest as attorney’s fees, and for all costs. At the time McCarthy was the owner of the Governor House Motor Hotel located on Canal *528 Street in the City of New Orleans. It appears that this business was heavily in debt and that there was not enough money realized from the sale of this property to pay its creditors. It further appears that Ton-ti’s attorney, Mr. Patrick E. Carr of the law firm of Carr and Kollin, was the Notary Public who passed the act of sale to the Governor House Motor Hotel from McCarthy to Tonti on August 27, 1971. The record also shows that McCarthy was represented by Mr. Dave Herman, attorney, and that Mr. Herman and Mr. Carr were actively engaged in efforts to make an acceptable settlement with all creditors of McCarthy and the Governor House Motor Hotel. The interrogatories served on Tonti were answered on December 1, 1971, and filed on December 3, 1971. It is admitted by Mr. Carr in his testimony on the trial of the rule to traverse that at the time the answers were filed in court he possessed the sum of $20,422.09 which belonged to McCarthy.
The holding of the trial court, as contained in his written reasons for judgment, is that:
{( * * *
“Therefore, when Tonti tendered $150,000.00 to Carr, and Carr in .turn proceeded to distribute the funds to McCarthy’s creditors, he (Carr) was acting in his official capacity as a Notary and not as Tonti’s attorney, and as such (Notary) his duty was to all the parties involved as a State official, not as Ton-ti’s attorney, and Tonti thereby relinquished forever all right, title, interest, and/or control it might have possessed over the $150,000.00. Tonti could not get it back, and as a matter of law had Tonti attempted to control Carr (Notary) in the disbursements, and Carr had followed Tonti’s instructions, Carr would have breached his duty as a Notary and would have become liable to McCarthy and McCarthy’s creditors as well; Carr, as Notary, could not have done anything but discharge his duties to both the Vendor and Vendee, and, therefore, Tonti merely paid over the purchase price as any normal vendee in any Act of Sale and as far as Tonti was concerned the transaction was over, the .same as when anyone tenders money to another for the purchase of goods, certainly he does not expect to get the money back or to be able to control who shall ultimately get it, or a part of it, other than his immediate vendor.”
Appellant, in its brief contends the trial court erred:
“ * * * in finding that the funds were beyond Tonti’s control when paid to Carr, its attorney-notary, since that attorney-notary reserved the right of decision as to which creditors of McCarthy would be paid. The control of the attorney-notary was the control of Tonti due to the principal-agency relationship.
“The Court erred in finding that Carr, as notary, acted in a purely independent, public-official status, not subject to the control of Tonti, when he was, in fact, the employee of Tonti.”
Appellant argues that the trial court erred in its rationale because it was guided by the case of Succession of Michel, La. App., 225 So.2d 480 (1969), the facts of which are inapposite to the instant case and has no application herein.
Plaintiff’s argument is grounded in the position that Mr. Carr was acting throughout in the capacity of attorney for Tonti, having complete control of the funds, as indicated by the testimony set forth below. It further argues that Mr. Carr had a continuing relationship with Tonti which did not cease when Mr. Carr as an incident to the relationship acted as Notary in confection of the transaction.
Plaintiff cites the case of Grand Isle Camp Sites, Inc. v. Cheek, La.App., 262 La. 5, 262 So.2d 350 (1972), in which the court, on page 359 (262 So.2d), stated:
“ * * * 'The attorney-client relationship is contractual in nature and is based *529 upon the express agreement of the parties as to the nature of work to be undertaken by the attorney.’ * *
Tonti’s argument is that Mr. Carr was holding the funds of McCarthy in the independent position of Notary, that the funds were paid to Carr as Notary and that Ton-ti had no control of the funds after that time.
The brief of Tonti, prepared by Mr. Carr who continues to represent Tonti in this appeal states in its brief that:
“The cash portion of the purchase price was paid to Patrick E. Carr, the Notary, by TONTI for disbursement to creditors of McCarthy and to McCarthy if there were any amounts in excess of amounts due creditors.”
We find this statement is not accurate as shown by the testimony of Mr. Carr quoted below wherein he stated that $8,000.00 of these funds were paid on October 19, 1971, by Tonti to the law firm of Carr and Kol-lin. This being the law firm that was representing Tonti.
The testimony of both Mr. Carr and Mr. Herman is of importance in determining the true relationship between Tonti and Mr. Carr to the McCarthy funds.
The following testimony is quoted:
“DIRECT EXAMINATION BY MR. NELKIN:
Q Mr. Carr, perhaps you can tell the Court, did you, on the 3rd of December, 1971, hold any funds in connection with the purchase by Tonti Management Corporation of the Governor House Motor Hotel for McCarthy?
A Yes, sir. I held twenty-four thousand, twenty-two hundred, twenty-four dollars nine cents. This is as of December 3.
Q As of the date of the Answers?
A Yes.
Q What was to be the disposition of those funds?
A They were being held for the purpose of determining — .first of all, all of the funds were deposited with me; initially, $150,000.00. This was the sale and purchase price of the equity over and above all the liens. There was over $14,000.00, or thereabouts. The total monies were $162,000.00 and this would concern inventories over and above, $164,183.20. I held the funds for the purpose of paying back taxes, withholding both state, parish and city taxes, the first and second mortgage holders, and, as a matter of fact, I have given you a statement of the monies paid out. I paid out a total of $143,161.11. And, by way of time, which you are looking for, Tonti Management Corporation gave $150,000.00 to me on September 2. Then I made a final statement, which I furnished him a copy of, furnished you a copy of, showing that Tonti owed a balance, after we paid the final computations. I furnished this October 13. He owed a balance of $8,025.07. That added • to the balance I already had made the $20,422.09 that I referred to. I had the $20,422.09, less the $8,025.07 at all times, and on the 22nd of October, ’71, I deposited in my account, special account, that $8,025.07 paid in by Tonti. So, on December 3 I held $20,422.09 for the account of McCarthy’s creditors.
MR. NELKIN:
I don’t think I need to ask Mr. Carr any other questions.
THE COURT:
You had this $20,000.00 in your possession?
THE WITNESS:
Yes, for the distribution of the creditors. As a matter of fact, Mr. Herrmann was going to make an effort, or was making an effort with the creditors to pay them on a pro rata basis, without depositing the money *530 in the registery of the Court. There were many open-account creditors.
THE COURT:
Do they have a judgment?
MR. NELKIN:
We had a judgment. Our judgment was initially some $3,652.30. That is the balance now. $3,652.‘37.’ As a result of seizures on bank accounts we recovered some $400.00. Our position was simply: Mr. Carr was holding the money for McCarthy through its principal, Tonti. The Answers to interrogatories I and II are patently incorrect.
(Off the record.)
THE WITNESS:
I was holding the funds for the account for the creditors for tax liens or priority liens that would come to past [sic], just as I would if I passed a sale on a house or piece of land.
(Off the record.)
THE COURT:
But the money belonged to McCarthy?
MR. CARR:
Absolutely correct.
THE COURT:
That’s what he is asking.
THE WITNESS :
And it has been deposited in the bankruptcy Court. Every bit of the money is still there.
MR. NELKIN:
As of the date of answering the interrogatories, December 3, 23 were entitled to a candid answer, that they had $20,000.00.
MR. CARR:
But, Your Honor, Tonti was entitled to no part of that money. I couldn’t have given any part of that money to Tonti. He paid it for the purchase price.
THE COURT:
But you were holding it for McCarthy and acting as the attorney for Tonti.
MR. CARR:
I was acting as the escrow agent.
THE COURT:
I think if it would have been — I think if it was another escrow agent, he would have gotten the money. I think it’s McCarthy’s money. That’s the whole issue.
MR. CARR:
No doubt. The issue here in his Answers, ‘Did Tonti Management Corporation have any control over the money at all — ’
THE COURT:'
Yes. Until you disbursed it — you had the control, and you were representing Tonti.
MR. CARR:
I was representing both in that instance, Your Honor, and holding the money to the extent that I couldn’t give any money to Tonti. Anything paid out would have to be paid out for the benefit of McCarthy, and any overage had to> go to McCarthy. He had no control over it. I did. If I issue the interrogatories to me, certainly I would have answered saying that I had it. Tonti had no control over it. It was McCarthy’s money, to be used by me to pay McCarthy’s privileged debts.
(Off the record.)
THE COURT:
Your Answers to the interrogatories were not correct. I think you should have disclosed that this money was held in escrow. Whether that makes you liable? I will be glad for you to furnish me memorandum.
(Off the record.)”
*531 “MR. CARR:
I call Mr. Hermann.
(( * % * a
“DIRECT EXAMINATION BY MR.
CARR:
Q- You are the attorney for McCarthy Construction Company, Mr. Hermann, and the transaction involving the sale of the Governor House?
A Correct.
Q You were present in all preliminary negotiations in connection with it?
A That’s correct.
Q Do you know what the agreement was between the parties as to the disposition of the funds, or of the amount paid for the purchase price?
A Yes.
Q Will you tell the Court what that agreement was?
A I can’t give you dollar amounts without looking at files, but McCarthy Construction, before the sale was hopelessly insolvent, they were delinquent on — not two, as you said when I first came in— but three mortgages, first, second and a third. They owed rent, besides, and they owed taxes, besides. In addition, it looked to me like there were dozens of creditors that were unsecured and we knew that it was a lost cause so far as trying to keep that corporation operating. McCarthy received not one dime from any of the monies that were paid, directly, indirectly or in any fashion, and he obviously won’t get any of it. My law firm and myself have taken no fees either, because we know of the insolvency of the corporation and we knew there just wasn’t enough money in the pot to pay McCarthy’s privileged secured and unsecured creditors. When Tonti Management came along it was a question of trying to salvage, and on that basis we worked out an arrangement whereby Tonti would pay X dollars for the motel, without a bulk sale. But that the purchaser — but that the sellor [sic] would get none of that money, that it would go only to pay his secured privileged creditors, and then his unsecured creditors, and that’s the way we stand today.
Q Mr. Hermann, who was to handle the money for the purpose of distribution to creditors ?
A You were, long enough to be positive that the secured and privileged creditors were paid. Anything left was to be paid into the registry of the Civil District Court, or Bankruptcy Court, depending on which way we had to go. When you were satisfied that the purchaser could not be hit with any more privileged debts, particularly for taxes and for particularly in connection with the mortgages already in the state of foreclosure, they were demanding attorneys fees and everything like that, then the money would be paid out to unsecured creditors if anything was left.
MR. CARR:
No further questions.”
“CROSS-EXAMINATION BY MR. NELKIN:
Q As of the 3rd of December, 1971, had either E. J. McCarthy, Sr., or the company, been adjudicated bankrupt?
A No.”
“THE COURT:
This check of October, $8,000.00, final payment, who was the check made payable to?
MR. CARR:
To Carr & Kollin.
THE COURT:
All right.”
Aside from whatever • relationship Carr had to any other party, he was definitely in a fiduciary relationship to Tonti. Tonti declared that Carr was its attorney, and regardless of whatever other relationship *532 he had to others, he was obliged to protect the interest of Tonti. There can be no dispute that the funds which Mr. Carr held did not belong to Tonti, and that those funds were under the control of Carr as attorney for Tonti. The check, by which at least $8,000.00' was disbursed by Tonti, was to the law firm of Carr and Kollin. Control and ownership are two distinct concepts of possession.
The testimony of Mr. Robert T. Tonti, president of Tonti Management Corporation, in response to questions by Mr. Nel-kin, is significant.
(( * * ijc
“Q And Mr. Carr was acting in the capacity of attorney for Tonti Management, is that correct?
A I think it was agreed — yes, he was our attorney. It was also agreed he was working with Dave Hermann, the sellors [sic] attorney, say in a group therapy program, to try and bring this thing to a conclusion, yes.
* * * »
Above all else, it is perfectly clear from the testimony of Mr. Tonti, Mr. Carr and Mr. Herman, supra, that Mr. Carr’s primary obligation to his client, Tonti Management Corporation, was not to release the funds, which had been delivered to him by <Tonti for McCarthy (which admittedly were McCarthy’s funds), to the detriment of Tonti. Tonti’s argument that Mr. Carr could not have given the funds back to Tonti is merely supportive of the fact that the funds were legally the property of McCarthy. This does not alter the fact that Carr, as attorney for Tonti, had funds of McCarthy under Tonti’s control, and that Mr. Carr, as attorney for Tonti, did not truthfully answer the interrogatories propounded by plaintiff of Tonti.
This type of proceeding, a procedure to reach funds of a judgment debtor in the hands of a third party, is not the proper setting for an exercise in semantics. It is the intention of the law that a full disclosure of facts be made by a party interrogated. Tonti, acting through its agent and attorney, did not make a full, accurate and truthful disclosure of the fact that it had in its hands and under its control funds of sufficient amount to satisfy the writ of fieri facias which had issued.
Tonti’s and its attorney’s relationship as agent and attorney to the funds which had been paid to the law firm of Carr and Kol-lin were so interwoven and entwined as to make a full disclosure of the facts necessary to the proper response to the interrogatory.
I respectfully dissent.
On application for rehearing, plaintiff contends we failed to consider the fact that the notary paid $8,000.00 to his own law firm (for work as the garnishee’s attorney and not for work as notary) as evidence that the notary was continuously acting as agent for the garnishee.
The payment occurred two months before the garnishment was served. The determinative issue is whether the corporate garnishee (through its employees, agents or attorneys) had funds of the judgment debt- or in its possession or under its control at the time the garnishment was served.
Even if the garnishee, in its answers to the garnishment interrogatories, had disclosed (as plaintiff contends it should have) the fact that it knew funds of the judgment debtor were being held by a depositary, the service of the garnishment on the garnishee (rather than on the depositary) could not serve to effect seizure of the funds, when the garnishee had already relinquished possession of and control over the funds to the depositary.
The application is denied.