STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 CA 1224

KRISTIN PEARCE

VERSUS

ROSS FORREST LAGARDE

*Judgment Rendered:* OCT 0 7 2021

********

Appealed from the 22nd Judicial District Court
In and for the Parish of St. Tammany
State of Louisiana
Case No. 2014-13656

The Honorable William H. Burris, Judge Presiding

********

| | |
|---|---|
| Jacques F. Bezou, Jr. | Counsel for Plaintiff/Appellant |
| Jacques F. Bezou, Sr. | Kristin Pearce |
| Covington, Louisiana | |
| and | |
| Charlotte C. Mead | |
| New Orleans, Louisiana | |
| | |
| Gus A. Fritchie, III | Counsel for Defendants/Appellees |
| Gretchen F. Richards | Ross F. Lagarde and Jones Lagarde, LLC |
| New Orleans, Louisiana | |
| | |
| Philip F. Cossich, Jr. | Counsel for Defendant/Appellee |
| Belle Chasse, Louisiana | Durand Seafood, LLC |

BEFORE: McDONALD, LANIER, AND WOLFE, JJ.

**LANIER, J.**

Plaintiff, Kristin Pearce, appeals the March 3, 2020 judgment of the district court, granting an exception raising the objection of no right of action and an alternative motion for summary judgment in favor of defendants, Ross Forrest Lagarde ("Ross") and Jones Lagarde, LLC (sometimes hereinafter collectively referred to as "Lagarde") and dismissing, with prejudice, her legal malpractice claims against Lagarde. For the reasons set forth below, we affirm in part and vacate in part.

## FACTS AND PROCEDURAL HISTORY

The termination of a community property regime between Kristin and her former husband Randy Pearce forms the basis of the present legal malpractice action by Kristin against Lagarde. The record reveals that Kristin and Randy were married in April 2002 and lived under a community property regime. In 2006, Randy started a seafood processing plant called Doran Seafood, L.L.C. ("Doran"). A federal investigation into Doran led to the parties deciding to terminate the community property regime and separate their property such that Randy would become the sole owner of the parties' interest in Doran and in the company that owned the land on which Doran was located, and Kristin would become the sole owner of all other former community assets, including the family home, the cars and other movables, and their interests in several restaurants.

According to the record, Randy originally spoke with attorney David Lukinovich about terminating the community property regime. However, he ultimately decided to use Ross for the separate property agreement. During this time, Kristin was working for Baumann & Associates and was the outside certified public accountant ("CPA") for Jones Lagarde. As evidenced by the email string from December 29, 2009, Ross communicated to Randy and Kristin what was required in order to get the separation agreement in place by the end of the year.

2

He also advised that one of them would need independent counsel to review the documents. In a letter dated December 30, 2009, Ross confirmed that Randy and Kristin had been advised that independent counsel was required and that Kristin had, in fact, consulted with Troy Ingram regarding the implications of the agreement. On that same date, the Separation of Property Agreement was signed by the parties, and a petition for court approval of the agreement was filed by Ross on behalf of both Randy and Kristin.

Following a court hearing on March 16, 2010, a judgment was signed approving said agreement, terminating the community property regime previously existing between Randy and Kristin. During the court hearing, Kristin confirmed that she was represented by counsel before she entered into the agreement, indicating that Troy Ingram was her counsel. Although Mr. Ingram waived his appearance for the hearing on March 16, 2010, his name was listed on the judgment as counsel for Kristin.

Concerning Ross's representation of her and Randy during this time, Kristin testified that it was her belief that Ross was jointly representing both her and Randy in the partition of the community property regime in 2009. She acknowledged that she consulted with Mr. Ingram regarding the Separation of Property Agreement, but indicated that she never paid Mr. Ingram, did not sign an engagement letter with him, and did not have an ongoing legal relationship with him either before or after he reviewed the agreement for her. Kristin indicated that the last communication from Ross regarding the Separation of Property Agreement was a letter dated March 30, 2010, that included his invoice for "professional fees and services rendered." The invoice from Ross, in the amount of $1,645.00, was paid with a check, signed by Kristin, from Randy and Kristin's joint checking account. According to Kristin, Ross ended this letter with the following statement, "Should you have any questions regarding this matter please do not hesitate to

3

contact me." When asked if she followed the advice to contact him with any questions about the agreement, Kristin replied, "[e]ssentially," and continued with her explanation of what transpired in the fall of 2013.

Kristin testified that once the trouble with Doran was over, the parties were experiencing marital problems. Kristin indicated that she and Randy were contemplating divorce and that Randy wanted to return to the community property regime. Kristin believed Randy wanted to do this so that he could get half of his property back. Kristin testified that Randy first contacted Ross to find out what was required to end the separate property regime. According to Kristin, Ross then contacted her by phone to explain what Randy's wishes were.

According to Kristin, Ross told her that "because Louisiana was a default community property state, all we had to do was really orally agree to go back to community. But if we wanted to make it more formal, more proper, we could address it in an [email]." Kristin testified in her deposition that Ross called her on her cell phone. However, the phone records introduced into evidence did not reflect that call. When confronted with this issue, Kristin indicated that the call could have been on a land line, as she and Ross would often call each other at work. However, when asked about the phone records from her office, Kristin indicated that her former employer would not allow access to the records due to the confidentiality of the records.

On August 16, 2013, Kristin and Randy both sent the following identical email to Ross:

> I, [name], hereby request that the separate property agreement entered into between ... [spouse name] and myself be terminated. I fully understand that any assets and/or liabilities incurred during the time the separate property agreement was in force will now become community property.
>
> I, [name], waive my right to separate legal counsel. I am aware of the conflict of interest you and/or your firm, Jones Lagarde, LLC has

4

representing both parties in this matter. I understand it may indeed be in my best interest to seek separate legal counsel.

When asked where the language for the email came from, Kristin testified that Ross told her what to write. She further testified that approximately thirty minutes after the emails were sent, she received another phone call from Ross, at which time he told her that "all is fine" and that they were "back in community" and "nothing further has to be done." According to Kristin, when she and Randy later divorced in 2013, they "both believed that [they] were in community property, and [they] filed accordingly." However, she indicated that Randy later changed his position on the issue, claiming that the separate property agreement was in full effect.

Kristin added that she did not recall speaking with Brice Jones, Ross's law partner at the time, about the fact that she and Randy were contemplating going back into the community property regime and how they could facilitate the process. In fact, Kristin testified that she did not consult with any other attorney about the parties returning to community property. However, when questioned about the five phone conversations she had with Mr. Ingram from July 29, 2013, until August 8, 2013, Kristin did not deny that the calls occurred.

Kristin, who is a CPA and has a Master's in Business Administration, testified that in 2003, Randy donated half of his home to her to convert the property to a community asset. Kristin acknowledged that she knew some form of legal document was required to transfer the home because it was immovable property.

Randy's recollection of these events differs from Kristin's. According to Randy, he had no intention of divorcing Kristin in August 2013. Randy testified that at that time, he and Kristin were having marital problems caused by Kristin's infidelity, but that they were in counseling. He added that he was trying to do

5

everything he could to keep his marriage together. Randy indicated it was not until October that he realized that things were not going to work out between him and Kristin. Randy further testified that sometime between March 2010 and August 2013, Kristin donated some of the properties that she had received in the separate property partition back to him. Randy described the properties as "50 percent of three restaurants, and one restaurant that I owned by myself before we were married that wasn't community property." He noted that this was done as an authentic act before a notary.

With regard to the August 16, 2013 email that he sent to Ross, Randy testified that Kristin called him and asked him to copy and paste language from an email she sent him and send it to Ross. Randy indicated he had no idea where the language for the email came from and did not have any discussions with Ross about the email, either before or after the emails were sent. Moreover, regardless of what was in the email, Randy did not believe that Ross was representing him with regard to any issues addressed therein. Randy further testified that in 2013, he did not want to go back to the community property regime. Approximately three months after the August 16, 2013 emails were sent, Randy filed for divorce.

When asked about his relationship with Ross, Randy acknowledged that they were friends and that their sons were the same age. He added that while they have been on hunting and fishing trips together in the past, they had not been on any trips together in the past few years. Randy noted that their sons talked more and were "more friends." He further testified that he and Ross do not go to dinner or socialize together.

Ross testified that with regard to the separation of the community property that was done in 2009 for Randy and Kristin, he represented Randy. He never considered Kristin to be his client, as he had her acknowledge that she needed separate counsel. Although Ross did not have a specific recollection of the August

6

16, 2013 emails, he did not deny that the emails were received in his office. However, he did not open a file, send any emails or letters in response, or bill any time to either Randy or Kristin with regard to anything said in the emails. He denied calling Kristin and telling her what language to use in the emails, and further added that if either Randy or Kristin had asked what was required to go back into community, he would have advised that they needed a lawyer to draft a document to transfer the assets accordingly. Ross acknowledged that his phone records confirmed a call from his cell phone to Kristin's cell phone approximately 30 minutes after the emails were sent. However, he had no recollection of the specifics of that conversation.

With regard to his relationship with Randy and Kristin, he acknowledged that he was friends with both of them. Ross indicated that he met Kristin first because she was an accountant for his law firm. It was not until the legal issue developed with Randy's business that he was introduced to Randy. Ross testified that he and Randy would hunt and fish together maybe once a year, but that he had not duck hunted with Randy in two or three years.

Brice Jones testified he was familiar with Kristin because of the accounting work she did for the law firm and for him personally. Brice indicated that Kristin was routinely in and out of their office, probably ten to fifteen times a year, either picking up or dropping off information. Brice also knew Randy and had handled an issue for Randy with the United States Attorney's Office involving the mislabeling of seafood products. However, Brice indicated that issue was disposed of quickly and that because Randy was Ross's client, he "turned it over to" Ross. Brice acknowledged that in addition to their attorney/client relationship, Ross and Randy were friends, who "hunted and fished together a lot [sic]."

With respect to the issues raised in the instant appeal, Brice's testimony was derived from an affidavit that was prepared by Brice and his attorney. According

7

to Brice, Kristin had stopped by his office one morning and questioned him about how she could go about reinstating the community property regime between her and Randy. Although Brice could not recall exactly when this took place, he assumed it happened after the Separation of Property Agreement had been signed and prior to the August 16, 2013 emails. Brice advised Kristin that she needed to have a lawyer draft the appropriate documents to undo the agreement. He further advised Kristin that Lagarde may have a conflict of interest because of the prior representation and that the conflict would have to be waived. When asked what advice he would have given a client had he received the August 16, 2013 emails in question, Brice testified that he would have advised the client to execute an authentic act before a notary. Although he was unaware if Ross had ever given that advice to either Kristin or Randy, he later learned from Ross that both Kristin and Randy believed that the community property regime had been reestablished.

On August 13, 2014, Kristin filed a petition alleging legal malpractice against Ross and Jones Lagarde, LLC.[1] Kristin asserted that she retained Ross to terminate the community property regime between herself and Randy. She further asserted that when she and Randy later communicated their wish to reinstate the community regime, Ross failed to revoke the acts of donation necessary to do so. Lagarde filed an answer generally denying the allegations of Kristin's petition and asserting that at no time did they represent Kristin or form an attorney-client relationship with her.

Thereafter, Lagarde filed an exception raising the objection of no right of action and alternative motion for summary judgment. Lagarde argued that they never acted as Kristin's attorney with regard to the August 16, 2013 emails and, thus, she had no right of action to assert a claim for legal malpractice. In the

---

[1] Although Kristin named "ABC Insurance Company" in her petition as the insurer of Ross and Lagarde, the claims asserted by Kristin were dismissed, with prejudice, by the district court before an insurance company was brought into the litigation.

alternative, Lagarde asserted that summary judgment was warranted "as to whether [Ross] provided any legal advice as to the use of an 'email exchange' to re-establish the community between Kristin and Randy Pearce given that the vast weight of the undisputed evidence confirms that no such advice was ever provided."

Kristin subsequently filed a motion for partial summary judgment on the issue of the existence of an attorney-client relationship. Kristin argued that based on the undisputed facts of the case, Ross manifested an intent to represent Kristin and either knew or should have known that she was relying on his legal services.

The matters were set for hearing on February 6, 2020, at which time the district court heard testimony from Kristin, Randy, and Ross. The judge further acknowledged reading all attachments, affidavits, and depositions that had been submitted by the parties with their respective motions. At the close of the evidence, the district court concluded that summary judgment was warranted in favor of Lagarde. When asked if the exception raising the objection of no right of action was granted as well, the district court stated, "It seemed an awful [lot] like a summary judgment to me instead of an exception. But I mean six to one, half a dozen to the other. So yes, I suppose so."

The district court signed a judgment on March 3, 2020, granting Lagarde's exception raising the objection of no right of action and motion for summary judgment, denying Kristin's motion for partial summary judgment, and dismissing, with prejudice, all claims filed by Kristin against Lagarde.

It is from this judgment that Kristin has appealed, assigning the following specifications of error:

> 1. The [district court] erred in concluding that Kristin Pearce lacked an objectively reasonable belief that Ross Lagarde and his firm represented her in the matter involving her property agreement in 2013, when that conclusion is based on its finding that Kristin Pearce, a layperson, should have known Mr. Lagarde's advice was not actually achievable under the law and despite finding that Mr. Lagarde represented her on the same issue with the same parties in 2009.

2. The [district court] erred in making credibility determinations between witnesses and finding the testimony of some to be self-serving and others to be "impartial."

3. The [district court] erred in finding that the conflicting testimony did not create genuine issues of material fact such as to preclude granting defendants-appellees Motion for Summary Judgment.

## LAW AND ANALYSIS

Except as otherwise provided by law, an action can only be brought by a person having a real and actual interest that he asserts. La. Code Civ. P. art. 681. The peremptory exception raising the objection of no right of action tests whether the plaintiff has any interest in judicially enforcing the right asserted. **JP Morgan Chase Bank, N.A. v. Bookhaker**, 2014-0594 (La. App. 1 Cir. 11/20/14), 168 So.3d 421, 426; see also La. Code Civ. P. art. 927(A)(6). Simply stated, the objection of no right of action tests whether this particular plaintiff, as a matter of law, has an interest in the claim sued on. **Louisiana State Bar Association v. Carr and Associates, Inc.**, 2008-2114 (La. App. 1 Cir. 5/8/09), 15 So.3d 158, 165, writ denied, 2009-1627 (La. 10/30/09), 21 So.3d 292. The exception does not raise the question of the plaintiff's ability to prevail on the merits nor the question of whether the defendant may have a valid defense. **Falcon v. Town of Berwick**, 2003-1861 (La. App. 1 Cir. 6/25/04), 885 So.2d 1222, 1224. The party raising a peremptory exception bears the burden of proof. *Id.* To prevail on a peremptory exception pleading the objection of no right of action, the defendant must show that the plaintiff does not have an interest in the subject matter of the suit or legal capacity to proceed with the suit. *Id.*

"On the trial of the peremptory exception pleaded at or prior to the trial of the case, evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition." La. Code Civ. P. art. 931. Evidence supporting or controverting an objection of no right of action

10

is admissible for the purpose of showing that the plaintiff does not possess the right claimed or that the right does not exist. **Robertson v. Sun Life Financial**, 2009-2275 (La. App. 1 Cir. 6/11/10), 40 So.3d 507, 511. Where doubt exists regarding the appropriateness of an objection of no right of action, it is to be resolved in favor of the plaintiff. *Id.* at 512.

Generally, district court rulings maintaining exceptions raising the objection of no right of action are reviewed *de novo* on appeal because they involve questions of law. **In Re Succession of Clark**, 2006-2210 (La. App. 1 Cir. 11/2/07), 977 So.2d 1000, 1002. However, when evidence is introduced to support or controvert an exception of no right of action, factual findings are reviewed under the manifest error-clearly wrong standard of review. **State ex rel. Caldwell v. Molina Healthcare, Inc.**, 2018-1768 (La. 5/8/19), 283 So.3d 472, 477.

We note that by agreement, the parties in the instant case put on extensive evidence concerning the alleged attorney-client relationship between Kristin and Ross. In fact, in brief to this court, Lagarde notes that although the matter had not been set for an actual trial on the merits, the February 6, 2020 hearing was "lengthy." Neither party objected to any of the live testimony that was presented at the hearing. While Article 931 provides for evidence to be introduced on an objection of no right of action "when the grounds thereof do not appear from the petition," we find no instruction either in statute or jurisprudence that would put the burden on the district court to curtail the introduction of evidence should the court believe that the petition provides sufficient basis for a finding that a plaintiff has an interest in judicially enforcing the right asserted.

Moreover, once evidence is introduced, the district court's factual findings are reviewed under the manifest error standard of review. **State ex rel. Caldwell**, 283 So.3d at 477. Thus, the issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact finder's

11

conclusion was a reasonable one. **Stobart v. State through Dept. of Transp. and Development**, 617 So.2d 880, 882 (La. 1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. **Rosell v. ESCO**, 549 So.2d 840 (La. 1989); **Arceneaux v. Domingue**, 365 So.2d 1330 (La. 1978).

Traditionally, there are three elements to a legal malpractice claim: (1) the existence of an attorney-client relationship; (2) negligent representation by the attorney; and (3) loss to the client caused by that negligence. **MB Indus., LLC v. CNA Ins. Co.**, 2011-0303 (La. 10/25/11), 74 So.3d 1173, 1184. The existence of an attorney-client relationship turns not only on continuous contacts involving advice or service, but also on the client's subjective belief that such a relationship exists. **In re Letellier**, 98-2646 (La. 9/8/99), 742 So.2d 544, 547-548. However, the client's belief that an attorney represents him must be reasonable under the circumstances. See **In re Bordelon**, 2004-0759 (La. 1/7/05), 894 So.2d 315, 322; **Weinstein v. Weinstein**, 2010-1083 (La. App. 3 Cir. 4/13/11), 62 So.3d 878, 882. The requirement that the belief be reasonable is an objective standard. **Dwyer v. Binegar**, 2011-1782 (La. App. 4 Cir. 5/23/12), 95 So.3d 565, 571. "The claimant's subjective belief does not establish an attorney-client relationship unless the lawyer reasonably induced that belief." *Id.* (quoting Ronald E. Mallen and Jeffrey M. Smith, 1 Legal Malpractice §8:3 (2008 ed.)). The existence of the attorney-client relationship is a question of fact subject to manifest error review. **Sherwin-Williams Co. v. First Louisiana Const., Inc.**, 2004-0133 (La. App. 1 Cir. 5/6/05), 915 So.2d 841, 844.

The attorney-client relationship is contractual in nature and is based upon the express agreement of the parties as to the nature of work to be undertaken by the

12

attorney. **Grand Isle Campsites, Inc. v. Cheek**, 262 So.2d 350, 359 (La. 1972) (citing **Delta Equipment & Const. Co. v. Royal Indem. Co.**, 186 So.2d 454, 458 (La. App. 1 Cir. 1966)). Furthermore, when an attorney agrees to perform work for a client as to a particular matter, that agreement does not automatically extend and create an attorney-client relationship as to other business or affairs of the client. *Id.*

In **Delta Equipment & Const. Co.**, this court noted that, even if an attorney-client relationship previously existed as to certain matters, the mere mailing of a lawsuit to the attorney did not create an attorney-client relationship as to that matter:

> The duty to defend or represent imposes upon a member of the legal profession grave responsibilities which he may accept or decline at his election and for whatever reason he chooses. An obligation of such gravity and magnitude may not be involuntarily thrust upon an attorney-at-law by the unilateral election of a litigant to mail him legal documents without a prior understanding or agreement between the parties.

**Delta Equipment & Const. Co.**, 186 So.2d at 458.

The Restatement (Third) of the Law Governing Lawyers §14 (2000) provides some guidance in determining when an attorney-client relationship arises. That section provides, in pertinent part:

> A relationship of client and lawyer arises when:
>
> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
>
> (a) the lawyer manifests to the person consent to do so; or
>
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services ....

After considering all of the evidence in this matter, the district court made the following conclusions:

> If I'm to believe that she thinks or thought that [Ross] represented her at that time, she would have also had to have believed

13

that his purported instruction to simply send an [email], and it would revert everything back to the way it was, I guess goes toward whether or not she reasonably believed that [Ross] represented her.

Certainly, it's not quantity but quality. But it does seem to stack up as to whether or not that belief would be reasonable. With the 2003 donation of a piece of separate property to the community of acquets and gains that she had already signed, [Kristin] admitted to turning, that that is what she had to do to revert, to make [Kristin's] separate property from prior to the marriage part of the community. So she knew that had to have been done, because she did it 10 years prior.

[Brice's] testimony, since he is a disinterested party, does weigh heavily. That he stated in his deposition that he specifically told her, at least in general terms, what needed to be done, in order to accomplish what she was asking, to revert back to the community.

Although [Ross] doesn't seem to have any specific recollection of the conversation, he certainly took no future action to do anything that was requested within that, by those [emails].

The phone records aren't particularly important to me. I mean, obviously it does show that there was a phone conversation between [Ross] and [Kristin], subsequent to the [emails] being received by [Ross]. As to whether there was a phone call prior to that, I mean, hey, land lines exist. And those are, and that's a different situation.

The, another thing that weighs in my mind is that [Kristin] did have the prior experience of undoing the community property regime. So to say that it went through that much effort and that much time and having to go to court and having to file, sign all those papers, rather, was needed to undo the community property, it seems less likely that she could reasonably believe that with no formality, no authentic act, no court approval, nothing like that, that you could just simply redo community property by sending an [email].

And another thing that weighs in my mind is the fact that we are not dealing with an uneducated lady. Obviously [Kristin] is extraordinarily intelligent. To get past the CPA exams, to get an MBA, to do all of those things, and I would assume that through her experience with the CPA office, that she is familiar with engagement agreements and conflicts, at least as it would apply to accounting.

So all those are stacked on one side. And on the other side, the only thing that lends toward there being an attorney-client relationship, and that these [emails] were generally believed to do what she wanted them to do. Is the testimony of [Kristin].

Now, going back to 2009, and that's why I asked the question to [Kristin's counsel] earlier, whether or not that had a whole lot to do with it, whether or not there was any real indication of that being an

14

issue. And it doesn't seem like there was. She did get a good deal. She did get what she wanted accomplished accomplished.

And I see where he is coming from. Because of the representation, it may seem like she was, at least in some way, represented by [Ross]; that somehow in 2013, a couple [of emails] and a phone call could revert it all back.

But in my mind, there is a lapse in time. There is a pretty big distinction. And the only thing that is in favor of Ms. Pearce is her testimony. Which is self-serving. Everyone else that seems to be involved in this is on the other side of that V, as I say it.

So I don't frankly think there was a reasonable belief considering her business experience, her sophistication with business, her experience at least in the law practice of being a CPA, and knowing something about engagement agreements and those issues.

I think with all that being said, I don't think it's reasonable that [Kristin] genuinely believed that there was an attorney-client relationship. And even if she did have that reasonable belief that a relationship existed, I still don't think that it was reasonable for her to believe that those [emails] were sufficient to transfer everything back in to the community.

In reviewing this matter, we find the district court very closely and carefully considered all of the evidence presented. Likewise, we have thoroughly reviewed the evidence and applicable law and find that the record does not demonstrate that the district court was manifestly erroneous. As previously noted, without a prior understanding or agreement between Ross and Kristin, an attorney-client relationship cannot be involuntarily thrust upon Ross by the assumptions or presumptions made by Kristin through the email she sent to Ross in August 2013. There is no evidence of any discussion or agreement as to a fee arrangement between Ross and Kristin for legal advice or services concerning the email. Moreover, as noted by the district court in its reasons for judgment, even if we concede that there may have been an attorney-client relationship between Ross and Kristen in 2009, there is no indication in the record that Kristin reasonably contemplated any continuing duty on Ross's part over the next several years.

15

We conclude that the evidence in the record reasonably supports the district court's finding that Kristin lacked a reasonable belief that there was an attorney-client relationship between her and Ross. The district court's reasonable evaluations of credibility and reasonable inferences of fact must be afforded great deference. Kristin's arguments on appeal to the contrary are without merit.

Accordingly, we affirm that portion of the district court's March 3, 2020 judgment that granted the exception raising the objection of no right of action in favor of Lagarde, and dismissed, with prejudice, all of Kristin's claims against Lagarde. Because the district court's ruling on Lagarde's exception raising the objection of no right of action resolved all of the claims between Lagarde and Kristin, it is unnecessary for us to address the issues related to the summary judgment. For this reason, we vacate, as moot, the portion of the district court's March 3, 2020 judgment that granted summary judgment in favor of Lagarde.

### DECREE

For the above and foregoing reasons, we affirm that portion of the district court's March 3, 2020 judgment that granted the exception raising the objection of no right of action in favor of Ross Forrest Lagarde and Jones Lagarde, LLC, and dismissed, with prejudice, all of Kristin Pearce's claims. We vacate, as moot, the portion of the district court's March 3, 2020 judgment that granted summary judgment in favor of Lagarde. We assess all costs associated with this appeal against plaintiff-appellant, Kristin Pearce.

**AFFIRMED IN PART; VACATED IN PART.**